Desneige BERNIER, et al.

v.

RAYMARK INDUSTRIES, INC.

Supreme Judicial Court of Maine.

Argued June 2, 1986.
Decided Oct. 15, 1986.

McTeague, Higbee, Libner, Reitman, MacAdam & Case, G. William Higbee (orally), Brunswick, for plaintiffs.

Thompson, McNaboe & Ashley, Thomas R. McNaboe (orally), Mark G. Furey, Portland, for defendant.

Bernstein, Shur, Sawyer & Nelson, Peter J. Rubin (orally), Linda A. Monica, Portland, for intervenors.

Before McKUSICK, C.J., and NICHOLS, ROBERTS, VIOLETTE, WATHEN and SCOLNIK, JJ.

SCOLNIK, Justice.

The United States District Court for the District of Maine has certified to this court the following questions of Maine law pursuant to 4 M.R.S.A. § 57 (Supp. 1985–1986) and Rule 76B of the Maine Rules of Civil Procedure:

(1) Whether evidence of the state-of-the-art is admissible in an action based on 14 M.R.S.A. § 221 when the product defect alleged is a failure to warn;

(2) whether damages allowed under Maine's Wrongful Death Act are recoverable in an action based on 14 M.R.S.A. § 221; and

(3) whether 14 M.R.S.A. § 221 may be applied where all inhalation of the asbestos dust which caused the diseases and deaths complained of occurred before October 3, 1973, the effective date of the statute, but where the diseases were diagnosed and the deaths occurred after October 3, 1973.

The requirements for our acceptance of the questions of law from the federal court are met. *See Hiram Ricker & Sons v. Stu-*

*dents International Mediation Society,* 342 A.2d 262, 264 (Me.1975).[1] We answer the first two questions in the affirmative. We also answer yes to the third question, but in only the limited way described in this opinion.

## I. *Background*

Subject matter jurisdiction of the United States District Court in this case is based solely on diversity of citizenship. Thus the substantive law of Maine governs the action. The federal court has provided a statement of facts relevant to the present controversy. These facts may be summarized as follows.

Roland Bernier, the deceased husband of the plaintiff, Desneige Bernier, worked for Bath Iron Works (BIW) as a boilermaker from 1942 to 1945. During that tenure, Bernier inhaled asbestos dust from products manufactured and sold by the defendant, Raymark Industries, Inc. (Raymark), then known as Raybestos-Manhattan, Inc. After 1945, Bernier ceased working at BIW. He did not inhale any asbestos dust or fibers after that date. In 1975, he was diagnosed as having pleural mesothelioma, an asbestos induced cancer of the lining of the lungs. He died on February 16, 1979.

Frank Clark, the deceased husband of the plaintiff, Phyllis Clark, worked for BIW as an electrician from the late 1930's to 1948 and again from 1949 to 1970. While employed at BIW, he inhaled asbestos dust and fibers from Raymark products. As a result of his inhalation of the asbestos fibers, Frank Clark contracted lung cancer. His disease was diagnosed in 1978 and he died therefrom in May, 1979.

The plaintiffs sued Raymark in federal court for wrongful death, alleging negli-

gence and strict product liability under 14 M.R.S.A. § 221 (1980) for failure to give adequate warnings on its products that would alert purchasers or foreseeable users of the health hazards posed by the inhalation of asbestos dust.[2] Before trial, the plaintiffs asked the trial judge to exclude, with respect to their section 221 claims, so-called state-of-the-art evidence; evidence of what was known or reasonably could have been known by the defendant, or by medical or other experts, about the health hazards created by the inhalation of asbestos fibers at the time the various asbestos products were sold to BIW. The trial judge granted the plaintiffs' request. The plaintiffs proceeded to trial solely under section 221, dropping their negligence claims.

At the close of the evidence, the defendant moved for a directed verdict, contending, *inter alia,* that the application of section 221 to these cases would constitute an impermissible retroactive application of that statute because Roland Bernier and Frank Clark had not inhaled any asbestos dust from a Raymark product after October 3, 1973, the effective date of section 221. The trial judge denied the motion. In response to special interrogatories, the jury returned a verdict in favor of the plaintiffs.

Preliminary to the damages phase of the trial, the defendant argued that the plaintiffs could not recover damages available under Maine's Wrongful Death Act, 18-A M.R.S.A. § 2-804 (1981 & Supp.1985-1986), in an action based on section 221. The trial judge decided to allow the plaintiffs to present their wrongful death claims and to reserve a ruling on the matter until posttrial motions were presented. The jury awarded damages to the plaintiffs and judgment was entered.

---

**1.** In *Hiram Ricker & Sons,* we identified several requirements that must be met before a certified question will be considered. One requirement is that the answer to the question presented must "have controlling impact on a decision of the merits of the cause generally." 342 A.2d at 264. Another requirement is that "all material facts have been either agreed upon or resolved, and the case is in such posture that our

decision will, in at least one alternative, be '*determinative of the cause.*'" *Id.* (quoting *White v. Edgar,* 320 A.2d 668, 674-75 n. 10 (Me.1974) (emphasis in original)).

**2.** The complaints also contained a breach of warranty count, but the plaintiffs waived these claims prior to trial.

The defendant filed motions for judgments notwithstanding the verdict and for new trials, renewing its contentions that so-called state-of-the-art evidence was improperly excluded, that damages for wrongful death are not recoverable in an action based on section 221, and that section 221 cannot be applied when all inhalation of the asbestos dust from the defendant's product occurred prior to the effective date of the statute. The certified questions from the federal court to this court followed.

## II. *Admissibility of State-of-the-Art Evidence*

■ The first issue is whether state-of-the-art evidence is admissible in an action based on 14 M.R.S.A. § 221 when the product defect alleged is a failure to warn. Maine's strict liability statute, section 221, imposes liability on manufacturers and suppliers who market defective, unreasonably dangerous products. The seller becomes subject to liability if an unreasonably dangerous product causes injury to a foreseeable consumer or user. Thus, section 221 does not impose absolute liability on the part of the manufacturer; the product must be in some respect defective before liability will be imposed. *See generally Austin v. Raybestos-Manhattan, Inc.*, 471 A.2d 280, 282–83 (Me.1984). Section 221 provides in full:

> One who sells any goods or products in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to a person whom the manufacturer, seller or supplier might reasonably have expected to use, consume or be affected by the goods, or to his property, if the seller is engaged in the business of selling such a product and it is expected to and does reach the user or consumer without significant change in the condition in which it is sold. This section applies although the seller has exercised all possible care in the preparation and sale of his product and the user or consumer has not bought the product from or entered into any contractual relation with the seller.

■ Courts are divided on the issue whether in determining, for the purpose of strict liability, that a product is defective and unreasonably dangerous because of a failure to warn,[3] evidence that the defendant knew or reasonably should have known of the product's dangerousness is relevant, or whether knowledge is automatically imputed to the manufacturer regardless of the blameworthiness of his failure to know. The district court judge stated in this case that the plaintiffs moved to exclude "any evidence in support of the state-of-the-art defense" and that the issue was whether the defendant may introduce such evidence. In the context of this record, we answer the first certified question by stating that under section 221, when the product defect alleged is a failure to warn, the defendants may introduce evidence to show that they neither knew nor reasonably could have known, of the dangerous characteristics of asbestos.

■ The Legislature formulated section 221 directly from section 402A of the *Restatement (Second) of Torts* (1965).[4] *Aus-*

---

**3.** A product can be in a defective condition, unreasonably dangerous to the user or consumer as a result of an error in the manufacturing or design process or by the failure to warn of a product hazard. *See* Keeton, *The Meaning of Defect in Products Liability Law—A Review of Basic Principles,* 45 Mo.L.Rev. 579, 586–87 (1980).

**4.** Section 402A provides:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

*tin v. Raybestos-Manhattan, Inc.,* 471 A.2d at 286; *Adams v. Buffalo Forge Co.,* 443 A.2d 932, 940 (Me.1982). Since section 221 and its legislative history does not have anything to say about whether state-of-the-art evidence is relevant when the product defect is based on a failure to warn, the commentary to section 402A is an appropriate place to begin our analysis. That commentary makes clear that in determining whether a product is defective because of a failure to warn, the manufacturer is only required to warn of dangers about which he knew or should have known. Specifically, comment j to section 402A provides:

> *j. Directions or warning.* In order to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning, on the container, as to its use. The seller may reasonably assume that those with common allergies, as for example to eggs or strawberries, will be aware of them, and he is not required to warn against them. Where, however, the product contains an ingredient to which a substantial number of the population are allergic, and the ingredient is one whose danger is not generally known, or if known is one which the consumer would reasonably not expect to find in the product, the *seller is required to give warning against it, if he has knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge, of the presence of the ingredient and the danger.* Likewise in the case of poisonous drugs, or those unduly dangerous for other reasons, warning as to use may be required.
>
> But a seller is not required to warn with respect to products, or ingredients in them, which are only dangerous, or potentially so, when consumed in excessive quantity, or over a long period of time, when the danger, or potentiality of the danger, is generally known and recognized. Again the dangers of alcoholic beverages are an example, as are also those of foods containing such substances as saturated fats, which may over a period of time have a deleterious effect upon the human heart.
>
> Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous.

(emphasis added).

Under this standard, when the strict liability defect consists of a failure to warn, reasonableness of the manufacturer's conduct is a factor in determining whether the manufacturer had a duty to warn. The conduct should be measured by knowledge at the time the manufacturer distributed the product. Given the scientific, technological and other information available when the product was distributed, did the manufacturer know or should he have known of the danger. In other words, did he have actual or constructive knowledge of the danger. A product-related danger may be regarded as knowable "if the available scientific data gave rise to a reasonable inference that the danger is likely to exist." Wade, *On The Effect in Product Liability of Knowledge Prior to Marketing,* 58 N.Y.U.L.Rev. 734, 749 (1983). A manufacturer is held to the knowledge and skill of an expert, and is required to test his products and keep abreast of scientific discoveries related to his products, but he has a duty to warn only of dangers that the employment of the reasonable foresight of an expert could reveal. *See Borel v. Fibreboard Prods. Corp.,* 493 F.2d 1076, 1089–1090 (5th Cir.1973) (Wisdom, J.) (applying Texas law), *cert. denied,* 419 U.S. 869 (1974). *See generally* 1A L. Frumer & M. Friedman, *Products Liability* § 12.07[3] (1985). We find no reason to depart from the *Restatement's* commentary for pur-

(b) the user or consumer has not bought *the* product from or entered into any contrac-

tual relation with the seller.

poses of interpreting Maine's strict liability statute.

■ We accordingly reject the plaintiffs' contention that when the product defect is premised on a failure to warn, the manufacturer's actual or constructive knowledge of his product's danger is irrelevant. A clear majority of courts, relying on comment j of section 402A of the *Restatement*, have concluded that an asbestos product is not defective unless the manufacturer knew or should have known of the product's danger at the time of distribution. *See, e.g., Jackson v. Johns-Manville Sales Corp.*, 727 F.2d 506, 515 (5th Cir.1984) (applying Mississippi law), *aff'd in part, rev'd in part*, 750 F.2d 1314 (5th Cir.1985) (en banc); *questions of state law certified*, 757 F.2d 614 (5th Cir.1985) *certification declined*, 469 So.2d 99 (Miss.1985), *aff'd*, 781 F.2d 394 (5th Cir.1986) (en banc), *cert. denied*, —— U.S. ——, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1986). *Hardy v. Johns-Manville Sales Corp.*, 681 F.2d 334 (5th Cir. 1982) (applying Texas law); *Karjala v. Johns-Manville Sales Corp.*, 523 F.2d 155, 158–59 (8th Cir.1975) (applying Minnesota law); *Borel v. Fibreboard Paper Prods. Corp.*, 493 F.2d 1076, 1088 (5th Cir.1973) (applying Texas law), *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1971). *See also Carter v. Johns-Manville Sales Corp.*, 557 F.Supp. 1317, 1320 (E.D.Tex. 1983); *Daniels v. Combustion Engineering, Inc.*, 583 S.W.2d 768, 773 (Tenn.App. 1978). *See generally* W. Prosser & W. Keeton, *The Law of Torts*, § 99, at 697 (5th ed. 1984); Keeton, *The Meaning of Defect in Products Liability Law—A Review of Basic Principles*, 45 Mo.L.Rev. 579, 586–87 (1980); Wade, *supra.* at 760–61.

In the decision primarily relied on by the plaintiff, *Beshada v. Johns-Manville Prods. Corp.*, 90 N.J. 191, 447 A.2d 539 (1981), the New Jersey Supreme Court held that an asbestos manufacturer's knowledge of his product's defect in a failure-to-warn case is irrelevant for purposes of products liability. 447 A.2d at 546–49. It reasoned that to predicate a manufacturer's liability

on whether he knew or should have known of the danger is to revert to a negligence standard, thus defeating the purpose of strict liability. *Id.* Between the producers of a dangerous product and innocent victims of a dangerous condition created by a failure to warn, the court reasoned that it is fairer that the latter "should bear the unforeseen costs of the product." *Id.* at 549. *See also Kisor v. Johns-Manville Corp.*, 783 F.2d 1337 (9th Cir.1986) (applying Washington law).

The New Jersey Supreme Court, however, has subsequently limited *Beshada* to the "circumstances giving rise to its holding" and adopted the foreseeability test in comment j of section 402A that, in a warning context, actual or constructive knowledge on the part of the manufacturer at the time of distribution is relevant in determining the applicability of strict liability. *Feldman v. Lederle Labs.*, 97 N.J. 429, 479 A.2d 374, 388 (1984). In so doing, the court recognized that the requirement that the danger be reasonably foreseeable at the time the product is sold is an important limitation on the seller's liability. To impose liability on a manufacturer, who at the time of distribution was not aware and from a scientific view point could not be aware of the danger that caused the injury, would make the manufacturer the virtual insurer of his product. As Judge Wisdom explained in *Borel v. Fibreboard Paper Prods. Corp.*, 493 F.2d at 1088,

Here, the plaintiff alleged that the defendant's product was unreasonably dangerous because of the failure to give adequate warnings of the known or knowable dangers involved. As explained in comment j to section 402A, a seller has a responsibility to inform users and consumers of dangers which the seller either knows or should know at the time the product is sold. The requirement that the danger be reasonably foreseeable, or scientifically discoverable, is an important limitation of the seller's liability. In general, "[t]he rule of strict liability subjects the seller to liability to

the user or consumer even though he has exercised all possible care in the preparation and sale of the product." Section 402A, Comment a. *This is not the case where the product is alleged to be unreasonably dangerous because of a failure to give adequate warnings. Rather, a seller is under a duty to warn of only those dangers that are reasonably foreseeable.* The requirement of foreseeability coincides with the standard of due care in negligence cases in that a seller must exercise reasonable care and foresight to discover a danger in his product and to warn users and consumers of that danger.

(emphasis added and omitted, footnote omitted).

█ We conclude that section 221 does not impose absolute liability. When a plaintiff alleges that a defendant's product was unreasonably dangerous because of a failure to give adequate warnings, the actionability of the product should be determined according to the knowledge and information available to the manufacturer at the time of distribution. A strict liability failure-to-warn case does resemble a negligence action because the reasonableness of the manufacturer's conduct is the critical issue. A manufacturer has a responsibility to inform users and consumers of dangers about which he either knows or should know at the time the product is sold. Accordingly, state-of-the-art evidence is relevant in determining whether the defendant is liable in a failure-to-warn case based on 14 M.R.S.A. § 221. We answer the first question in the affirmative.

### III. *Wrongful Death*

The second issue presented is whether damages allowed under Maine's Wrongful Death Act are recoverable in an action based on 14 M.R.S.A. § 221. Maine's Wrongful Death Act, 18-A.M.R.S.A. § 2-804, provides in relevant part:

> (a) Whenever the death of a person *shall* be caused by a wrongful act, neglect or default, and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, then the person or the corporation that would have been liable if death had not ensued shall be liable for damages as provided in this section, notwithstanding the death of the person injured and although the death shall have been caused under such circumstances as shall amount to a felony.

The defendant contends that the phrase "wrongful act, neglect or default" in section 2-804 denotes only fault-based conduct and since section 221 imposes liability without fault, a wrongful death action cannot be maintained. Although one court has adopted this view in interpreting similar statutes, *see Ford Motor Co. v. Carter*, 239 Ga. 657, 238 S.E.2d 361, 365 (1977), we think the position is untenable.

█ By its own terms, section 2-804 is not limited to situations where the death producing conduct is based on fault. The statute authorizes a cause of action not only in cases of neglect but also for "wrongful acts." Under section 221, the manufacturer commits a wrongful act when he puts a defective or unreasonably dangerous product into the stream of commerce. *See Austin v. Raybestos-Manhattan, Inc.*, 471 A.2d at 285; *Adams v. Buffalo Forge Co.*, 443 A.2d at 941. An action based on section 221 is clearly encompassed within our wrongful death statute.

█ We also find without merit defendant's argument that the plaintiffs cannot maintain a wrongful death action because section 221 limits recovery only to persons who have been physically injured by a defective product. Nothing in section 221 limits the class of plaintiffs to the persons actually harmed. The statute merely states that for liability to exist, the person injured must be a person who might reasonably be expected to use or consume the goods in question. Furthermore, the long recognized test for determining whether a wrongful death action can be

maintained is whether the deceased, if living, could have recovered damages. *See Klingerman v. Sol Corp. of Maine*, 505 A.2d 474, 475 (Me.1986); *Metrinko v. Witherell*, 134 Me. 483, 485, 188 A. 213, 214 (1936). Under this test, if the decedents could have brought an action under section 221, the plaintiffs can recover under the wrongful death statute in an action based on 14 M.R.S.A. § 221. Accordingly, we answer the second question in the affirmative.

## IV. *Applicability of Section 221*

■ The final issue is whether section 221 applies when the inhalation of the asbestos dust that caused the diseases and deaths complained of occurred before the effective date of the statute, October 3, 1973, *see* P.L. 1973, ch. 466, but the diseases were not diagnosed and deaths did not occur until after that date. Roland Bernier last inhaled the asbestos fibers from the defendant's product in the period from 1942 to 1945, while Frank Clark last inhaled asbestos material in 1970. The defendant argues that to allow recovery in these circumstances constitutes an impermissible retroactive application of the statute.

In *Adams v. Buffalo Forge Co.*, 443 A.2d at 941–44, we analyzed the problem of retroactively applying section 221 and examined the Legislature's purpose in specifying the statute's temporal application. In that case, the defendant, a manufacturer of an allegedly defective drill press, sold the product before October 3, 1973, but the plaintiffs were not injured by that product until 1979.[5] The defendant argued that section 221 did not apply "if any operative event—whether that event is the sale of the product or the injury— ... occurred before October 3, 1973." 443 A.2d 939–40.

We pointed out in *Adams* that section 2 of P.L.1973, ch. 466, which enacted 14 M.R.S.A. § 221, provided that "[t]his Act shall not be construed to affect *any cause of action arising prior to the effective date of this Act*." *Adams v. Buffalo Forge Co.*, 443 A.2d at 942 (quoting P.L. 1973, ch. 466, § 2) (emphasis in original). Emphasizing our view that "a cause of action alleging strict liability is one which sounds in *tort*, not contract," *id.* at 940 (emphasis in original), we said:

> We think it erroneous ... to describe the sale of goods as the operative event upon which liability must stand or fall.... Actual liability is established only when "physical harm [is] thereby caused to a person." 14 M.R.S.A. § 221.

*Id.* at 942. We rejected the contention "that Section 221 does not apply merely because the sale of the allegedly defective, unreasonably dangerous product occurred prior to the effective date of the statute ...," and held that the "[p]laintiffs' cause of action did not arise prior to the effective date of Section 221 and is not precluded by the provisions of section 2 [of P.L. 1973, ch. 466]." *Id.* at 942.

■ A cause of action arises under section 221 when a person has a *judicially recognizable* claim against a defendant. *See Adams v. Buffalo Forge Co.*, 443 A.2d at 943.[6] To answer the third certified ques-

---

5. The plaintiff who was physically injured by the drill press was joined by his wife in his suit against the manufacturer.

6. In reaching this conclusion in *Adams*, we relied upon *Williams v. Ford Motor Company*, 342 A.2d 712, 718 (1975), a case involving the question of when a negligence action for injuries caused by a defective automobile arises or accrues under the applicable statute of limitations. The Legislature did not define when a "cause of action arises" in section 2 of P.L. 1973, ch. 466. In the absence of any explicit legislative direction, the process of defining this term is a judicial function. *See Myrick v. James*, 444 A.2d 987, 989–90 (Me.1982). Thus, reliance upon persuasive statute of limitations cases to determine "the precise substantive elements of [a] particular cause of action," *see Williams v. Ford Motor Co.*, 342 A.2d at 714 (emphasis omitted), is appropriate.

Principles articulated in *Williams* were applicable, by analogy, in *Adams* because *Williams* involved a products liability action where the plaintiffs sustained injuries at the same time that the harm-causing impact occurred. We have yet to decide, in the context of the statute

tion, we must decide whether the decedents had judicially recognizable claims against the defendant before October 3, 1973 because all of the asbestos dust that caused their injuries was inhaled before that date. The issue, narrowly stated, is whether inhalation of asbestos dust constitutes the physical harm that gives rise to a judicially recognizable claim against the defendant. We conclude that inhalation alone is insufficient to give rise to such a claim.

The nature of the physical injuries in the instant case is different from that in *Adams*. In *Adams*, contact with the defendant's product and the realization of physical injury associated with that contact occurred simultaneously. Bernier and Clark, on the other hand, came into contact with the defendant's asbestos products long before they were diagnosed as having diseases caused by those products. Although their contact with the harm-causing product occurred before the effective date of section 221, we cannot conclude from that fact alone that they also had physical injuries that would confer upon them judicially cognizable causes of action in tort before that date.

There is generally no cause of action in tort until a plaintiff has suffered an identifiable, compensable injury. As a leading treatise on tort law explains:

> Actual loss or damage resulting to the interests of another [is a necessary element of a negligence cause of action].... The threat of future harm, not yet realized, is not enough. Negligent conduct in itself is not such an interference with the interests of the world at large that there is any right to complain of it, or to be free from it, except in the case of some individual whose interests have suffered.

W. Prosser & W. Keeton, *supra*, § 30, at 165.

In the context of asbestos-related injuries, it can take anywhere from ten to forty years from the time of actual asbestos fiber inhalation for injuries or diseases, if any, to manifest themselves. *See Jackson v. Johns-Manville Sales Corp.*, 750 F.2d 1314, 1336 (5th Cir.1985); *questions of state law certified*, 757 F.2d 614 (5th Cir. 1985) *certification declined*, 469 So.2d 99 (Miss.1985), *aff'd*, 781 F.2d 394 (5th Cir. 1986) (en banc), *cert. denied*, — U.S. —, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1986); *Wilson v. Johns-Manville Sales Corp.*, 684 F.2d 111, 115, n. 21 (D.C.Cir.1982); *Norton v. C.P. Blouin, Inc.*, 511 A.2d 1056, 1061 (Me.1986). Because persons who inhale asbestos fibers may not know at the time that they will contract an asbestos-related disease, or indeed, may in some instances never contract such a disease, we are unable to conclude that a cause of action arises upon such inhalation, impact or exposure.[7] The actionable harm is the manifestation of disease in the body, not the exposure to the potentially hazardous substance

---

of limitations, when a tort cause of action arises or accrues for injuries associated with exposures to toxic substances that generate noticeable diseases only years after exposure. Although we adopted the "discovery rule" for certain malpractice cases, *see Myrick v. James*, 444 A.2d at 996; *Anderson v. Neal*, 428 A.2d 1189, 1192 (Me.1981), we must look to other jurisdictions for the appropriate analogous authority applicable to the case at bar. *See infra* note 7.

**7.** We find persuasive statutes of limitation cases in other jurisdictions that have determined when strict liability causes of action arise or accrue for plaintiffs exposed to asbestos dust. The majority of these cases hold that such a cause of action does not accrue until the plaintiff discovers or, in the exercise of reasonable care and diligence, should discover the fact that he is suffering from an asbestos-related disease.

*See, e.g., Clutter v. Johns-Manville Sales Corp.*, 646 F.2d 1151 (6th Cir.1981) (cause of action for asbestosis accrues upon "manifestation" of the disease) (applying Ohio law); *Karjala v. Johns Manville Prods. Corp.*, 523 F.2d 155, 160–61 (applying "discovery" rule for determining when a cause of action accrues for a person suffering from asbestosis (under Minnesota law); *Borel v. Fibreboard Paper Prods. Corp.*, 493 F.2d 1076, 1102 (asbestosis) (applying Texas law), *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974); *Harig v. Johns-Manville Prods. Corp.*, 284 Md. 70 394 A.2d 299 (1978) (mesothelioma); *Louisville Trust Co. v. Johns-Manville Prods. Corp.*, 580 S.W.2d 497, 501 (Ky.1979) (mesothelioma); *Nolan v. Johns-Manville Asbestos*, 85 Ill.2d 161, 52 Ill.Dec. 1, 421 N.E.2d 864 (1981) (asbestosis); *Coyne v. Porter-Hayden Co.*, 286 Pa.Super. 1, 428 A.2d 208 (1981) (asbestosis). Other cases involving injuries associated with

or some more abstract invasion of a person's legally protected interests. *Cf. Urie v. Thompson*, 337 U.S. 163, 170, 69 S.Ct. 1018, 1024, 93 L.Ed. 1282 (1949) (time of accrual of a railroad foreman's claim for damages resulting from his contraction of silicosis is when the accumulated effects of the substance manifest themselves). Even assuming that any inhalation of asbestos dust immediately causes microscopic injury to lung tissues, we conclude that the sub-clinical injury resulting from such inhalation is "insufficient to constitute the actual loss or damage to a plaintiff's interest required to sustain a cause of action under generally applicable principles of tort law." *See Schweitzer v. Consolidated Rail Corp.*, 758 F.2d 936, 942 (3rd Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 183, 88 L.Ed. 152 (1985).

The *Schweitzer* court arrived at this conclusion in determining whether asbestos-related actions under the Federal Employers' Liability Act (F.E.L.A.) existed before the filing of the defendants' bankruptcy petitions so as to qualify such claims as dischargeable. That Court explained:

> If mere exposure to asbestos were sufficient to give rise to a F.E.L.A. cause of action, countless seemingly healthy railroad workers, workers who might never manifest injury, would have tort claims cognizable in federal court. It is obvious that proof of damages in such cases would be highly speculative, likely resulting in windfalls for those who never take ill.... Requiring manifest injury as a necessary element of an asbestos-related tort action avoids these problems and best serves the underlying purpose of tort law: the compensation of victims who have suffered.

*Id.* at 942.

In even stronger language, the Fifth Circuit, in the context of an asbestos-related strict liability claim based upon "failure-to-warn" under Mississippi law, stated:

> In a sense, the injury in this case is the inhalation of asbestos fibers. It was not an *actionable* injury, however, meaning it was not legally cognizable, until at least one evil *effect* of the inhalation became manifest. There was no cause of action at all, in other words, until the asbestosis appeared.

*Jackson v. Johns-Manville Sales Corp.*, 781 F.2d 394, 412 (5th Cir.1986) (emphasis original), *cert. denied*, —— U.S. ——, 106 S.Ct. 3339, 92 L.Ed.2d 473 (1986).

 We agree with the reasoning of these federal courts. Having reaffirmed our conclusion in *Adams* that a strict liability claim brought pursuant to section 221 sounds in tort, we construe that statute to protect interests of injured parties according to "generally applicable principles of tort law." Those principles lead us to conclude that in actions under section 221 involving asbestos-related injuries, a judicially recognizable claim does not arise until there has been a manifestation of physical injury to a person, sufficient to cause him actual loss, damage or suffering from a defective, unreasonably dangerous product.

 On this record, we are unable to determine at what point in time, between the last inhalation of asbestos dust and the death of each decedent, such a manifestation occurred. We are constrained by the record before us to declare only that inhalation of asbestos dust, without more, is not a physical injury giving rise to judicially recognizable causes of action under section 221.

In conclusion, we answer the certified questions as follows:

other toxic substances that do not cause noticeable physical harm until years after exposure reach the same conclusion. *E.g., Urie v. Thompson*, 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949) (silicosis); *Barnes v. A.H. Robbins Co.*, 476 N.E.2d 84 (Ind.1985) (injuries caused by intrauterine device); *Raymond v. Eli Lilly &*

*Co.*, 117 N.H. 164, 371 A.2d 170 (1977) (DES). While these authorities are helpful because they provide insights into the elements that make up judicially cognizable "toxic tort" causes of action, we need not here decide whether a "discovery" rule applies to a case such as the one at bar for statute of limitations purposes.

1. Yes; the defendants may introduce evidence to show that they neither knew nor reasonably could have known, of the dangerous characteristics of asbestos;

2. yes; damages allowed under Maine's Wrongful Death Act are recoverable in an action based on 14 M.R.S.A. § 221; and

3. yes; 14 M.R.S.A. § 221 may be applied where all inhalation of the asbestos dust that caused the diseases and deaths complained of occurred prior to October 3, 1973, but where the diseases were diagnosed and the deaths occurred after that date if the decedents' diseases did not manifest themselves until after that date.

The Clerk will transmit the foregoing instructions to the District Court of the United States, District of Maine.

ROBERTS, WATHEN, JJ. and VIOLETTE, A.R.J. concurring.

McKUSICK, Chief Justice, with whom NICHOLS, Justice, joins, concurring in part and dissenting in part.

I fully concur with the court's answers to questions 1 and 2. My nonconcurrence relates exclusively to the court's answer to the third question certified by the United States District Court. The 1973 Legislature enacted 14 M.R.S.A. § 221 [1] effective October 3, 1973, to impose upon manufacturers and other sellers of products a strict liability in addition to the common law tort of negligence. The third certified question requires us to determine, in the particular set of circumstances presented by the cases at bar, the intent of the 1973 Legislature as to the temporal application of section 221. Specifically, we are asked whether the 1973 Legislature intended that the new statutory tort of strict liability was to apply to the category of fact circumstances represented by the *Bernier* and *Clark* cases, namely, cases where *both* the sale *and* the harm-causing impact upon the users occurred prior to October 3, 1973. My answer to that question is simply no.

I.

True to established principles of statutory interpretation, we can determine the 1973 legislative intent only by a conventional analysis applied directly to all available materials that are relevant to construing section 221 in the particular factual circumstances here presented. Our task in analyzing the scanty expressions of intent is to select an interpretation that we can say "with reasonable confidence [is] the most plausible alternative on the basis of the text and proper context." R. Dickerson, *The Interpretation and Application of Statutes* 221 (1975). That analysis shows, to at least a level of reasonable confidence, that the most plausible interpretation of the 1973 legislative intent dictates a negative answer to question 3. The 1973 Legislature meant that, in cases where the harm-causing impact had already occurred before it enacted the strict liability statute, the

---

1. P.L. 1973, ch. 466, which enacted what is now 14 M.R.S.A. § 221 (1980), reads in full as follows:

 Sec. 1. R.S., T. 14, c. 10, additional. Title 14 of the Revised Statutes is amended by adding a new chapter 10 to read as follows:

 CHAPTER 10
 LIABILITY

 § 221. Defective or unreasonably dangerous goods

 One who sells any goods or products in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to a person whom the manufacturer, seller or supplier might reasonably have expected to use, consume or be affected by the goods, or to his property, if the seller is engaged in the business of selling such a product and it is expected to and does reach the user or consumer without significant change in the condition in which it is sold. This section applies although the seller has exercised all possible care in the preparation and sale of his product and the user or consumer has not bought the product from or entered into any contractual relation with the seller.

 Sec. 2. Application. This Act shall not be construed to affect any cause of action arising prior to the effective date of this Act.

 The effective date of that Act was October 3, 1973.

rights and liabilities of the parties would continue to be governed solely by the common law rules of negligence.

Any statutory analysis must start with the text being interpreted, in this case P.L. 1973, ch. 466 (*see* n. 1 above). *See Perry v. Hartford Accident and Indemnity Co.*, 481 A.2d 133, 138 (Me.1984). Chapter 466 expressly contained only a partial rule of temporal *non* applicability; in its second section it provided that section 221 "shall *not* be construed to affect any cause of action arising prior to [its] effective date...." (Emphasis added) On the facts involved in *Adams v. Buffalo Forge Co.*, 443 A.2d 932, 942 (Me.1982) (post–1973 harm-causing impact), we found that provision of little help because, drafted in negative form, it does not provide a statement of the actions to which section 221 *does* apply. Nonetheless, the 1973 Legislature's explicit *restriction* on section 221's application does serve to reinforce "the fundamental rule of statutory construction strictly followed by this Court that all statutes will be considered to have a prospective operation only, unless the legislative intent to the contrary is clearly expressed or necessarily implied from the language used." *Miller v. Fallon,* 134 Me. 145, 148, 183 A. 416, 417 (1936). *See also Terry v. St. Regis Paper Co.,* 459 A.2d 1106, 1109 (Me. 1983) ("the Legislature [must] express its intent to apply a statute retroactively in 'strong, clear and imperative language' ") (quoting *Barrett v. Herbert Engineering, Inc.,* 371 A.2d 633, 635 n. 1 (Me.1977)). That explicit restriction expressed in negative form shows the 1973 Legislature's sensitivity to the unfairness of imposing a new or additional liability on the basis of past events upon someone who cannot do anything to avoid or mitigate that liability. Nothing in section 221, or in P.L. 1973, ch. 466 that enacted it, affirmatively directs by either clear expression or necessary implication that the strict liability newly created by statute should apply in the *Bernier-Clark* situation. That fact in itself is enough to require a negative answer to question 3.

In any event, there are additional reasons to believe that the 1973 Legislature did not intend section 221 to apply to the *Bernier-Clark* factual circumstances. The negative restriction imposed by section 2 of the 1973 enacting statute (*see* n. 1 above) upon the scope of section 221 fits closely the fact situation represented by the cases at bar. Such was not true in *Adams.* There we pointed out that on the *Adams* facts no section 221 cause of action had arisen prior to the 1973 date because both the use of the unreasonably dangerous drill press by the plaintiff and his coincident injury did not occur until 1979. The plaintiff user obviously had no possible cause of action on account of the offending drill press until that time because before then no "physical harm [had been] thereby caused to a person," the second requirement of section 221. In contrast, in the cases at bar the offending asbestos products sold by defendant Raymark Industries, Inc. had had their full and only harm-causing impact upon Mr. Bernier and Mr. Clark well before October 3, 1973—indeed about 30 years earlier for Mr. Bernier. No matter whether by October 3, 1973, objective symptoms of those asbestos-caused injuries had appeared, or whether by then the cause of those symptoms had been diagnosed, we now know as an unfortunate but irreversible fact that Mr. Bernier and Mr. Clark had suffered, during the period of time they inhaled asbestos dust, harm to their bodies that led to their disease and death. Regardless whether a court might declare that technically the *Bernier-Clark* cause of action did not arise at the time of the harm-causing impact, section 2 provides powerful evidence of a legislative distaste for imposing its new, enlarged strict liability upon a set of critical facts that as to both the potential plaintiff and the potential defendant were over and done with before October 3, 1973. That evidence of intent had no application to the *Adams* fact situation.

Considerations of common fairness, which we may confidently assume guided

the 1973 Legislature in enacting chapter 466, support the foregoing analysis of that Legislature's intent. In the context of the particular facts of the *Bernier* and *Clark* cases, I believe that fair-minded legislators were not likely to have imposed strict liability upon the manufacturer cumulatively to the existing common law liability for negligence. Here the sole product defect alleged by plaintiffs arose out of defendant's failure to warn of dangers of the product. In the *Bernier-Clark* situation, any opportunity to warn the user or to recall or redesign the product expired as soon as the user was last exposed to it—long before 1973. Once Mr. Bernier and Mr. Clark inhaled the asbestos dust, they had already suffered the only harm-causing impact that a warning might have spared them. In the physical harm done by dangerous products, as elsewhere, "the moving finger writes; and, having writ, moves on." *Rubaiyat of Omar Khayyam* (Edward Fitzgerald trans. 1952) at 66. In sharp contrast to the situation of defendant Raymark vis-à-vis Mr. Bernier and Mr. Clark, the manufacturer of the drill press that caused the 1979 injury to Mr. Adams had a six-year opportunity after enactment of section 221 to recall the drill press or to warn the user of its danger. To find whether the 1973 Legislature meant to treat the *Adams* and the *Bernier-Clark* situations in exactly the same way, we must examine section 221 "in the transforming light of [the] real life situation." *Lagasse v. Hannaford Bros. Co.*, 497 A.2d 1112, 1117 (Me.1985). After seeking legislative intent, the *Adams* court (443 A.2d at 944) concluded that the 1973 "Legislature could rationally and properly intend the occurrence of [the] injury" to the drill press user to be the event bringing the user's claim under section 221. It, however, cannot be concluded on the *Bernier-Clark* facts, where the manufacturer had no post-1973 opportunity for warning or recall, that nonetheless "the Legislature could rationally and properly intend" to impose the additional, heightened strict liability upon the manufacturer. It contradicts basic tenets of fairness to assume that the 1973 Legislature—without saying so explicitly or by necessary implication—intended to give a cause of action in strict liability where the manufacturer lacked any means whatever of preventing or mitigating harm from a product sold long in the past.

In sum, standard methods of statutory construction lead to a negative answer to the third certified question.

## II.

The court's opinion reaches a contrary conclusion as a result of its failure to seek out the intent of the 1973 Legislature as to the *Bernier-Clark* circumstances. In my judgment the opinion goes astray in several specific respects. First, rather than approaching the third question as one involving the 1973 Legislature's intent, the court's opinion cites *Adams* (443 A.2d at 943), without quoting it, for the court's present pronouncement that "[a] cause of action arises under section 221 when a person has a *judicially recognizable* claim against a defendant." (*See* p. 541) The court's opinion then goes through a doctrinal exercise—completely detached from what the 1973 Legislature in context is likely to have intended—to determine when *this court*, not the Legislature, would view Mr. Bernier and Mr. Clark to have judicially recognizable claims. The court's present reading of *Adams* as laying down for all fact situations a rule of temporal application that doctrinally controls our answer to question 3 is, I believe, entirely unjustified. Our fact-specific finding of legislative intent[2] in the radically different circumstances involved in *Adams* (all harm-causing im-

---

2. In *Adams* we laid out with particularity the process by which our conclusion was there reached:

[W]e look first to the intent of the Legislature as to the application of Section 221 and to the events it intended to be significant in the determination of legal consequences under Section 221.

443 A.2d at 942. Any such approach is conspicuously absent from the court's opinion in the case at bar.

pact there having occurred *after* the effective date of section 221) tells us nothing of what the 1973 Legislature intended in the *Bernier-Clark* situation (all harm-causing impact here having occurred before 1973). Our task here is to find the 1973 Legislature's intent on the specific *Bernier-Clark* facts, *not* to make a theoretical doctrinal extension of a rule abstracted from the specific legislative intent found by us on the very different *Adams* facts.

Second, the court's opinion treats the 1973 enactment as if section 2 had been written to read: "This Act shall apply to any cause of action arising after the effective date of this Act." That is *not* how the 1973 Legislature framed section 2. *See* n. 1 above. By section 2 the Act was *not* to be construed to affect any cause of action *arising prior to* its effective date, but section 2 did not say conversely that all causes of action arising after October 3, 1973 would be "affected" or controlled by the new Act. Least of all did section 2 say that any and all causes of action that this court might later find became "judicially recognizable" after October 3, 1973, were to be controlled by section 221. Even though the court's opinion in the cases at bar declares that the cause of action on the *Bernier-Clark* facts arises when discovered, rather than at the time of harm-causing impact, section 2 of the 1973 statute did *not* say that the new strict liability should then automatically apply in those particular fact circumstances. *See Adams,* 443 A.2d at 942. To find the intent of the 1973 Legislature, we must look at the whole text *and* context of the 1973 enactment, not at just a reconstructed section 2.

Third, beyond *Adams,* the court's opinion in answering question 3 relies upon cases from outside Maine that decide issues entirely different from the question certified to us. All but two of those out-of-state cases are statute-of-limitation cases (*see* at

p. 542 n. 7), which applied a discovery rule for determining whether a subsisting cause of action was time-barred; not whether a legislature is likely to have intended to create an additional strict liability cause of action against manufacturers whose products had already completed their harm-causing impact upon users. The equitable and other policy considerations leading a court to apply a discovery rule in order to defer the start of a period of limitations are obviously very different from the public considerations the 1973 Legislature would weigh in deciding the temporal applicability of a cumulative, heightened liability it was imposing on product manufacturers effective October 3, 1973. Note that the 1973 Legislature was *not* cutting off the existing negligence cause of action. Rather, it was creating a second, additional cause of action and we must find *when* the 1973 Legislature intended the second layer of liability to start to apply to defective products.

The judicial lawmaking in adopting a discovery rule[3] in the out-of-state cases relied upon by the court's opinion involved an equitable balancing of the interests of the competing parties in light of the purposes of statutes of limitation; those purposes "include encouraging promptness in instituting actions, suppressing stale or fraudulent claims, and avoiding inconvenience which may stem from delay when it is practicable to assert rights." *Harig v. Johns-Manville Products Corp.,* 394 A.2d 299, 302 (Md.1978). *See also Raymond v. Eli Lilly & Co.,* 117 N.H. 164, 170, 371 A.2d 170, 174 (1977). It is true that, in creating a new and cumulative cause of action, the 1973 Legislature would also take into account considerations of fairness as between the potential litigants. Those considerations, however, would have little or nothing to do with the rationale underlying statutes of limitation and they weigh

---

**3.** Courts do not adopt a discovery rule as the result of determining legislative intent. Rather, *"the discovery rule is a judicial creation,* fashioned to solve a specific problem, namely, whether the law should preclude recovery for an injury that not even a diligent party may reasonably be expected to discover." *Anthony v. Koppers Co.,* 425 A.2d 428, 432 (Pa.Super.Ct. 1980) (emphasis added), *reversed on other grounds,* 496 Pa. 119, 436 A.2d 181 (1981).

heavily *against*, rather than *for*, imposing a new, heightened liability upon sellers of products that have already in the past had their unrecallable harm-causing impact upon their users.

With exactly as little or much justification as the out-of-state statute-of-limitation cases, our own recent decisions that for the first time applied a discovery rule in certain circumstances could be cited and relied upon directly by the court's opinion here. *See Myrick v. James*, 444 A.2d 987 (Me. 1982) (statute-of-limitation discovery rule applied in medical malpractice cases), *overruling Tantish v. Szendey*, 158 Me. 228, 182 A.2d 660 (1962) (injury from surgeon's leaving foreign object in patient's body occurred at time of operation). *See also Anderson v. Neal*, 428 A.2d 1189 (Me.1981) (statute-of-limitation discovery rule applied in legal malpractice case). Citation of those Maine cases would immediately expose, however, the incongruity of looking to judicial decisions involving statutes of limitation for the purpose of divining what the 1973 Legislature intended on a quite different subject. It is true that in negative terms the 1973 Legislature excluded from being affected by section 221 "any cause of action arising prior to the effective date of this Act." P.L. 1973, ch. 466, § 2, *see* n. 1 above. Although that language bears some resemblance to the language of the statutes of limitation involved in *Myrick* and *Anderson* which bar suits commenced more than a prescribed period "after the cause of action accrues," it takes a bold leap to assert that the similar words were intended by the 1973 Legislature to mean the identical thing in two different contexts. Indeed, if we assume *arguendo* that the 1973 Legislature in selecting the "cause of action arising" language had in mind incorporating by reference judge-made statute-of-limitation rules then exist-

ing in Maine, the conclusion is mandated that it intended section 221 *not* to apply to the *Bernier-Clark* circumstances. In 1973 *Tantish v. Szendey, supra*, involving a foreign object left in the body after surgery, was the controlling declaration by the Law Court that a cause of action accrues for statute-of-limitation purposes when a wrongful invasion of the person occurs, even though no manifestation or discovery of that wrong occurs until later.[4]

Finally, even under the *Adams* formulation and the out-of-state statute-of-limitation cases cited by the court's opinion, section 221 does not apply on the *Bernier-Clark* facts. *Adams* concluded that the 1973 Legislature "intend[ed] the occurrence of an *injury* to be the event to give an injured party" a cause of action under section 221. *Adams v. Buffalo Forge Co.*, 443 A.2d at 944 (emphasis added). Although the cited out-of-state cases applied a discovery rule to defer the start of the period of limitation, nearly every one expressly recognized that the injured party had in fact suffered *injury* at a time earlier than the time of discovery. *See, e.g., Harig v. Johns-Manville Products Corp.*, 394 A.2d at 305 ("In cases where the initial injury is inherently unknowable, ... the statute of limitations should not begin to run until the plaintiff should reasonably learn of the cause of action"). Those cases applied a discovery rule, regardless of when the *injury* had occurred, on the basis of considerations relevant to the purposes of statutes of limitation. *Id.* at 302. Thus, the cases cited by the court's opinion do not logically support the ascription to the 1973 Legislature of an intent to impose the new strict liability on products that had already prior to 1973 had their full harm-causing impact upon the plaintiff users.

In sum, error in decisional methodology has led the court's opinion to an end result

---

**4.** When the 1973 Legislature was enacting section 221, the Maine rule declared by *Tantish v. Szendey* was by no means unique to this state. In fact, the 1971 edition of *Prosser on Torts* recognized that the older or traditional approach was represented by such cases as *Tant-* *ish v. Szendey* and that at that time the discovery rule had been extended beyond medical malpractice claims only by "a sprinkling of cases." *Prosser on Torts* § 30 at 144–45 (4th ed. 1971).

that, in my view, is diametrically opposed to what both the text and proper context of section 221 show is the most plausible interpretation of the 1973 Legislature's intent on the *Bernier-Clark* facts.

### III.

Despite defendant Raymark's argument framed in constitutional terms (at p. 541), I do not view question 3 as asking whether application of section 221 to the *Bernier-Clark* facts would be unconstitutional. That is here a difficult question, and the answer given by *Adams*, based on the facts of *Adams*, 443 A.2d at 943, does not answer the question for *Bernier* and *Clark*. To respond to question 3, however, we need not decide that difficult constitutional question. There is no imperative at work in legislative affairs that impels new statutory causes of action to go to the brink of unconstitutionality.[5] On the contrary, by an established canon of statutory construction, legislators are presumed to avoid constitutional problems. *See Maine Milk Producers v. Commissioner of Agriculture*, 483 A.2d 1213, 1218 (Me.1984). Constitutional concerns as well as an innate sense of fairness would lead the 1973 Legislature, I am confident, to limit the new strict liability to situations like *Adams* where the harm-causing impact occurred after section 221 took effect, leaving unchanged a user's cause of action for injuries caused by previous impact by defective products to be governed by the common law of negligence.

I would answer question 3 in the negative; 14 M.R.S.A. § 221 does not apply where all inhalation of the asbestos dust that caused the diseases and deaths complained of occurred before October 3, 1973, regardless of when the physical harm from the dust manifested itself or was diagnosed.

5. As said in *Miller v. Fallon*, 134 Me. 145, 148, 183 A. 416, 417 (1936), "It does not follow ... that, because the legislature possessed the power

to enact a retroactive statute of limitations, ... it did so in the passage of the amendment under consideration."