United States Court of Appeals
For the First Circuit


No. 96-2258

CHRISTOPHER MOULTON,

Plaintiff, Appellee,
v.

THE RIVAL COMPANY,
Defendant, Appellant.


APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. David M. Cohen, U.S. Magistrate Judge] 


Before
Boudin, Circuit Judge, 

Aldrich, Senior Circuit Judge, 

and Lynch, Circuit Judge.  

Ernest J. Babcock, with whom Elizabeth A. Germani, George D. 
Guzzi and Friedman & Babcock were on brief, for appellant. 

Charles Harvey, with whom Harvey & Frank was on brief, for 
appellee.



June 20, 1997


LYNCH, Circuit Judge. A one-year-old boy sustained LYNCH, Circuit Judge. 

severe, disabling burns when he was left alone in a room

where a Rival Company electric potpourri pot was operating on

the floor. A diversity action was brought against the

company asserting claims under Maine law of strict liability,

negligence and breach of warranty. A jury found in favor of

the plaintiff on the strict liability and negligence claims

and awarded $2.2 million. The company filed post-trial

motions alleging a host of procedural and evidentiary errors

and seeking judgment as a matter of law. The trial court

denied the motions; the company appealed. We affirm.

I

We recite the facts as a jury could reasonably have

found them. See Stevens v. Bangor & Aroostook R.R., 97 F.3d 

594, 596 (1st Cir. 1996). Gail Moulton, plaintiff's mother,

purchased a Rival Model 3207 electric potpourri pot. Water

and dried flowers or scented liquid and wax are heated in the

pot and allowed to evaporate to perfume the air. The

potpourri pot was a modified version of a Rival kitchen

product, a one-quart slow cooker. The cover of the potpourri

pot could not be secured to the pot and had a hole in its

center, approximately one and three-quarters inches in

diameter, to allow fragrance to escape. The date Rival sold

this particular potpourri pot is not known.

-2- 2

Literature accompanying the pot contained several

warnings, including: "Close supervision is necessary when

any appliance is used by or near children." Mrs. Moulton

read the instructions and warnings and placed the potpourri

pot under a table in a corner of the living room hidden

behind pottery and baskets. In February 1995, she left her

one-year-old son Christopher in the living room while she got

him a drink from the adjoining kitchen. She heard a noise

and returned to the living room to find the child sitting on

the floor in a pool of liquid. The cover was off the pot, in

the puddle of liquid potpourri. She did not notice where the

pot itself was.

No one knows exactly how the accident happened. It

is reasonable to conclude either that the pot tipped over,

spilling the heated liquid, or that the child took the cover

off. In any event, the lid came off the pot, and the hot

liquid came into contact with the child's arm and hand.

Plaintiff's left hand and arm were severely burned

in the accident. He spent over a month at the Shriners Burns

Hospital in Boston undergoing extensive treatment. He will

need extensive medical treatment in the future. His left

hand and arm are entirely covered by scar tissue, which does

not grow like normal skin. As he grows, the inflexible scar

tissue must be released by surgical incisions to prevent his

joints from growing abnormally; skin grafts are used to fill

-3- 3

in the gaps, and a physical therapy regimen is necessary to

restore movement to the hand. This cycle of growth, surgery

and physical therapy will continue until the plaintiff stops

growing, at around age twenty.

The type of potpourri pot involved in the

plaintiff's accident evolved from earlier products. Rival,

which manufactures various household appliances, decided to

market an electric potpourri pot. Before placing the item on

the market, Rival submitted the item, which it called the

Model 3207, for evaluation by Underwriters Laboratories

("UL"), an independent not-for-profit testing laboratory

which sets and publishes safety standards; these standards

are often adopted by the American National Standards

Institute.

UL replied that the pot did not meet the relevant

safety standards. UL sent Rival a letter in June 1987 which

stated that the potpourri pot heated liquids to temperatures

exceeding the applicable standard, and noted that, since the

lid had no means of being secured and had a one and three

quarters inch hole in its center, it could not be relied upon

as a barrier to prevent scalding. UL therefore refused to

"list" the pot.1 However, by the time the UL report was

issued, Rival had already set production to commence in

 

1. A "listed" product would bear a sticker indicating that
the laboratory had determined that the product met a
particular safety standard.

-4- 4

August 1987. Despite UL's rejection, Rival decided to go

ahead with its production plans anyway.

Rival submitted the potpourri pot to ETL testing

laboratories, a commercial (for profit) laboratory. ETL

issued a report certifying that the potpourri pot met the

very standard that UL had reported the pot failed to meet.

The ETL report should have raised concerns on its face. The

stated temperature in the report to which the pot heated

liquids was too high to meet the applicable standard. The

product was nonetheless put on the market.

The Model 3207 potpourri pot was the only Rival

product not listed by UL. This apparently troubled Rival

officials. They ordered various tests to determine whether

the item could be modified to meet the evolving safety

standards adopted by UL. Rival's product safety engineer

reported that UL had determined that water hotter than 149

degrees Farenheit could cause serious skin burns on contact

and that the potpourri pot was designed to reach a

temperature of 174 degrees Farenheit. Rival was also aware

that UL took the position that this product, unlike cooking

appliances, was likely to be "touched, bumped, handled, or

even upset when used as intended." Consequently, UL wanted

limitations placed on the temperature and quantity of the

liquid and wanted a tight-fitting lid. Rival's competitors

-5- 5

produced potpourri pots with locking lids. However, no

modifications were made to the Model 3207.

After the potpourri pot had been on the market for

a short time, Rival began to receive reports of young

children who were burned by accidental contact with the

heated potpourri mixture.2 Rival still made no modification

to the design. After 1991, the company changed the package

insert to warn consumers that the contents of the pot were

hot and that the pot should be kept out of the reach of

children.3 Accidents continued to occur in the early 1990's.

At some point, although the parties cannot pinpoint the exact

date, a tag warning that the product could cause burns to the

skin was placed on the cord of the Model 3206, a smaller

version of the Model 3207 that lacked any cover.

II

Plaintiff filed suit against the Rival Company in

November 1995 in federal court in Maine. The complaint

alleged that Rival was legally responsible for the

plaintiff's injuries because (1) the potpourri pot was

defective and unreasonably dangerous as a result of its

design; (2) Rival was negligent in designing the potpourri

pot and/or in failing to warn users of the product's design

 

2. Some of the accidents involved the Model 3207 (the model
in this case), while others involved a similar model.

3. The previous warning had stated that users should
supervise closely when the pot was operated near children.

-6- 6

defect; and (3) the potpourri pot failed to perform in

accordance with the express warranty. Rival defended on the

grounds that the product was safe, the warnings and

instructions adequate, and the blame for the accident lay

with the child's mother for placing the pot where her son

could reach it and then leaving him unattended.

After a one-week trial, the jury found in

plaintiff's favor on the strict liability and negligence

claims and awarded him $2.2 million in compensatory damages.

III

Post-Sale Duty to Warn 

The primary issue raised by Rival is whether the

district court erred in instructing the jury on negligent

post-sale duty to warn. The trial judge charged: 

When a manufacturer learns . . . of the
dangers associated with the reasonably
foreseeable use of its product after they
are distributed, the manufacturer must
take reasonable steps to warn reasonably
foreseeable users about those dangers
. . . .

Rival argues that the Maine Law Court has never imposed such

a post-sale duty on manufacturers and would not do so. The

plaintiff responds that the majority of jurisdictions

recognize a negligence-based post-sale duty to warn and that,

if faced with the issue, Maine would do the same.

We do not reach the issue of whether the Maine Law

Court would recognize a negligence-based post-sale duty to

-7- 7

warn because the jury verdict is adequately supported on a

strict liability claim and the damages are the same.

Further, no issues concerning the admissibility of evidence

turn on this.

The trial court separated the theories of strict

liability, negligence and warranty both in the jury

instructions and in the special verdict form. The jury

stated on the special verdict form that it found the

defendant liable on a strict liability theory as well as on a

negligence theory. Even if the instructions involving

negligent post-sale duty to warn were incorrect as a matter

of Maine law, the finding of liability on the strict

liability theory would be sufficient to support the judgment.

Rival maintains the issue must nevertheless be

reached. It argues that certain evidence was admitted at

trial in support of the plaintiff's theory that there had

been a negligent failure to warn and that this evidence was

both prejudicial and irrelevant to any of the other legal

theories advanced by plaintiff. The evidence in question

concerns what the defendant terms a subsequent remedial

measure: the placement of a warning tag on the electrical

cord of the Model 3206 (which is smaller than the Model 3207

and does not have a cover).4 The defendant argues that if,

 

4. This modification is not a subsequent remedial measure
for purposes of Rule 407 of the Federal Rules of Evidence.
That rule does not apply where, as here, the modification

-8- 8

as it claims, Maine would not recognize a negligent post-sale

duty to warn, this evidence was improperly admitted and

sufficiently prejudicial to warrant a new trial. We

disagree.

First, the trial court ruled that the warning tag

evidence was relevant to the issue of whether there had been

a negligent violation of a pre-sale duty to warn as well as

of a post-sale duty to warn. Although the sequence of the

placement of the warning tags and the sale of the appliance

is unknown, the defendant never challenged this evidentiary

ruling as to the pre-sale duty to warn. The point is waived.

Furthermore, even assuming arguendo that it was

error to admit the "cord tag" evidence, "the standard for

reviewing a district court's nonconstitutional error in a

civil suit requires that we find such error harmless if it is

highly probable that the error did not affect the outcome of

the case." Harrison v. Sears, Roebuck & Co., 981 F.2d 25, 29 

(1st Cir. 1992). Here, there was ample evidence of

defective design: the pot heated its contents to a

dangerously high temperature and did not have a locking lid.

Similar products produced by other companies did have a

locking lid. The refusal of UL to list the product is

particularly telling. We think it unlikely that the evidence

 

preceded the accident involved in the current lawsuit. See 
Bogosian v. Mercedes-Benz of N. Am., Inc., 104 F.3d 472, 481 
(1st Cir. 1997).

-9- 9

of cord tags placed on the Model 3206 affected the liability

determination.

Evidence of Other Accidents 

Plaintiff put in evidence of eight accidents in

which young children sustained burns after coming into

contact with the heated contents of a Rival potpourri pot.

Defendant objected to the introduction of this evidence, but

the trial court overruled the objection. Review is for abuse

of discretion. Espeaignnette v. Gene Tierney Co., 43 F.3d 1, 

8 (1st Cir. 1994). In evaluating evidentiary rulings, "[t]he

question is not whether we would strike the balance

differently in the first instance, but whether the balance

actually struck is so egregiously one-sided that it requires

reversal." Id. 

"Evidence of prior accidents is admissible . . .

only if the proponent of the evidence shows that the

accidents occurred under circumstances substantially similar

to those at issue in the case at bar." McKinnon v. Skil 

Corp., 638 F.2d 270, 277 (1st Cir. 1981); Marois v. Paper 

Converting Mach. Co., 539 A.2d 621, 625 (Me. 1988). The 

defendant argues that there is insufficient similarity

between the earlier accidents and plaintiff's accident,

because the circumstances surrounding the spills were

different. For example, in one of the earlier accidents, a

child knocked over the table where the potpourri pot was

-10- 10

located; in four others, a child became entangled in the cord

and pulled the pot over. Furthermore, two of the accidents

involved the Model 3206, a smaller pot with no cover at all.

"Substantial similarity" is a function of the

theory of the case. See Ponder v. Warren Tool Corp., 834 

F.2d 1553, 1560 (10th Cir. 1987). Here, the plaintiff was

burned by a large quantity of hot liquid escaping from a

potpourri pot without a locking lid. Plaintiff sought the

introduction of the evidence of the other accidents to show

that the product as designed allowed the rapid escape of a

significant amount5 of extremely hot liquid and was thus

defective. Cf. Jackson v. Firestone Tire & Rubber Co., 788 

F.2d 1070, 1083 (5th Cir. 1986). Under these circumstances,

there was no abuse of discretion. Cf. P.B. Mutrie Motor 

Transp., Inc. v. Interchemical Corp., 378 F.2d 447, 450-51 

(1st Cir. 1967).

Medical Costs 

Plaintiff presented the expert testimony of a

rehabilitation specialist as to the cost of plaintiff's

future medical and rehabilitation needs. Rival says that the

witness was not qualified and that his testimony lacked an

adequate factual basis.

 

5. Even electric potpourri pots with locking lids will allow
the escape of at least a very small amount of liquid if
tipped over; the appliance must have openings to allow the
fragrance to escape.

-11- 11

A trial court has wide discretion in determining

the admissibility of expert testimony, and we will reverse

its decision only when there has been a clear abuse of

discretion. Stevens, 97 F.3d at 600. The educational and 

work experience of plaintiff's expert made him well-qualified

to testify concerning theplaintiff's future medical expenses.

A somewhat closer question is whether there was a

sufficient factual basis for the expert testimony. Under

Maine law, damages may not be recovered if they are

contingent or speculative. Michaud v. Steckino, 390 A.2d 

524, 530 (Me. 1978). They must be "determined to a

probability." Id. 

Rival makes a two-pronged argument. It first

claims that the plaintiff failed to meet his burden of proof

on the damages issue, because everyone involved in the case

expects that the Shriners Hospital, which is treating the

child, will continue to provide all necessary care free of

charge. This argument is foreclosed by the collateral source

rule. Under that rule, a plaintiff who has been compensated

in whole or in part by a source independent of the tortfeasor

is nevertheless entitled to a full recovery against the

tortfeasor, to prevent the tortfeasor from gaining a

windfall. Werner v. Lane, 393 A.2d 1329, 1335 (Me. 1978). 

Defendant then argues that the plaintiff has failed

to prove future medical expenses to a reasonable certainty

-12- 12

because the testimony of plaintiff's rehabilitation expert

was different from that of the plaintiff's treating

physician. Plaintiff's rehabilitation expert presented an

itemized list of predicted future medical and rehabilitation

expenses. The plaintiff's treating physician testified that

it was impossible to predict the number or types of

procedures the plaintiff will need in the future because the

need for future care will depend on the plaintiff's growth

pattern and how the plaintiff improves over time. There was

an adequate foundation for the rehabilitation expert's

testimony and the jury was therefore free to credit it. Cf. 

Stevens, 97 F.3d at 600. 

As to the misstatement by plaintiff's counsel in

closing, when he mentioned "out of pocket" expenses, any harm

was ameliorated by the trial court's immediate curative

instruction. See Conde v. Starlight I, Inc., 103 F.3d 210, 

213 (1st Cir. 1997).

Testimony of Rival's President 

Defendant claims it was sandbagged when, at trial,

plaintiff made use of a statement by a Rival official, from a

deposition in another case, to impeach defendant's expert

witness. Defendant argues it had no opportunity to place the

company official's statement in its proper context. This

argument is not well taken. The defendant did not request a

continuance or any limiting instructions. Under these

-13- 13

circumstances, we cannot say the trial court abused its wide

discretion in admitting this evidence.

Sufficiency of the Evidence 

Finally, the defendant argues that the trial

court's denials of its Rule 50(b) motion for judgment as a

matter of law and of its motion for a new trial should be

reversed. It claims that the evidence, together with all

reasonable inferences in the plaintiff's favor, is

insufficient to support the verdict. Review is de novo. See 

Lama v. Borras, 16 F.3d 473, 477 (1st Cir. 1994). 

The defendant maintains that no reasonable jury

could find that any action by Rival was the proximate cause

of the plaintiff's injury. The defendant points to the Maine

Law Court's statement that "a product bearing . . . a

warning, which is safe for use if [the warning] is followed,

is not in defective condition, nor is it unreasonably

dangerous." Bernier v. Raymark Indus., Inc., 516 A.2d 534, 

538 (Me. 1986) (quoting Restatement (Second) of Torts 402A 

cmt. j (1965)). However, this language explicitly applies

only to claims that a product is unreasonably dangerous

because it lacks an adequate warning. Bernier, 516 A.2d at 

538. That was not the crux of plaintiff's claim here.

Plaintiff's theory was that the potpourri pot had design

defects -- heating its contents to an excessively high

temperature and no locking lid -- which made it unreasonably

-14- 14

dangerous. There was sufficient evidence supporting the jury

finding of liability on that theory of the case.

Affirmed. 

-15- 15