Gordon **PORTER**, Plaintiff,

v.

**PFIZER HOSPITAL PRODUCTS GROUP, INC.**, Defendant.

Civ. No. 90–0230–B.

United States District Court, D. Maine.

Jan. 22, 1992.

William J. Smith, Van Buren, Me., for plaintiff.

Gregory W. Powell, Friedman & Babcock, Portland, Me., for defendant.

## MEMORANDUM OF DECISION

BRODY, District Judge.

This products liability case arises out of a hip replacement operation performed on Gordon Porter, the plaintiff, on July 15, 1986. During the course of the operation, the surgeon drilled a hole in Porter's hip so that he could implant a 64mm one-piece acetabular cup without using cement. As the surgeon hammered the acetabular cup into place, however, the cup's polyethylene liner separated from the metallic backing. The broken cup had to be removed. The surgeon did not have an identical 64mm cup available and elected to complete the operation by cementing a slightly smaller 61mm cup in place. Although an artificial hip, cemented or uncemented, typically lasts at least six years and sometimes as long as twenty, the 61mm cup in Porter's hip loosened and had to be replaced two years later.

On July 10, 1990, after the statute of limitations for a medical malpractice suit

expired, Porter filed a lawsuit in state court against Pfizer Hospital Products Group, Inc. ("Pfizer"), the manufacturer of the 64mm acetabular cup.[1] The citizenship of the parties is diverse, and Pfizer removed the lawsuit to federal court in August, 1990.

This action came before the Court for a bench trial on November 12, 1991. Porter sought recovery under Maine statutory provisions governing breach of implied warranties of merchantability, 11 M.R.S.A. § 2–314(2) and fitness for a particular purpose, 11 M.R.S.A. § 2–315, as well as strict liability, 14 M.R.S.A. § 221.[2] After four days of testimony, counsel were asked to submit written argument.

The Court has closely reviewed the pleadings, the testimony and exhibits presented, and the written arguments of counsel. Pursuant to Fed.R.Civ.P. 52(a), the Court now makes the following findings of fact and conclusions of law.[3] In summary, the Court concludes that the Plaintiff failed to prove his breach of warranty and strict liability claims by a preponderance of the evidence.

## I. Findings of Fact

Gordon Porter is a sincere, candid thirty-seven year old man with a long and tragic history of hip problems. Though he was then only thirty-one, the 1986 operation out of which this lawsuit arose was the third major surgery performed on his right hip. Even if the operation had gone perfectly, it would not have been his last.

Porter resides in Van Buren, Maine with his wife and two children. Employed at various times as an ambulance attendant and a car mechanic, Porter sought a more sedentary line of work after undergoing two major hip operations. Before and after the July, 1986 operation, Porter was employed as a dental hygienist. Porter was well regarded by his employer, earning the prevailing wage for a dental hygienist in northern Maine: $85 per day, for four and five day weeks. According to his tax returns, Porter earned $20,315 in 1985, $15,391 in 1986, $25,706 in 1987 and $12,656 in 1988. Plaintiff's Exhibit 5. A small part of this income was derived from mail order sales and real estate sales commissions. *Id.* In 1986, Porter's earnings were lowered in part because he was unable to return to work from July until November while he was recuperating from surgery. Porter had generally adapted well to his hip problems which, prior to 1986, did not prevent him from enjoying a broad range of recreational activities with his family and friends.

Porter has suffered from hip problems since early childhood and has long had significant leg length disparities. When Porter was about five, he was diagnosed as suffering from Legg Perthes' disease, a degenerative hip disorder, in his left hip. For the following five years, "treatment consisted of use of crutches and no weight-bearing." Defendant's Exhibit 13 at 22. The problems with his left hip apparently resolved themselves, and he was permitted to resume normal weightbearing. *Id.* Soon afterwards, however, Porter developed similar problems with his right hip. Various forms of treatment failed to result in improvement.

---

1. The state court lawsuit named both Pfizer Hospital Products Group, Inc. and Howmedica, Inc. as defendants. Howmedica is now a division of Pfizer, not a separately incorporated legal entity.

   Pfizer also manufactured the 61mm acetabular cup which Porter's surgeon implanted after the 64mm acetabular cup broke. Porter did not allege that the 61mm cup was defective or the cause of any of his injuries.

2. During trial, Porter dropped his negligence and breach of express warranty claims.

3. On November 14, 1991, at the close of Porter's case, Pfizer moved for dismissal, citing Rule

52(c) of the Federal Rules of Civil Procedure. Because Rule 52(c) did not become effective until December 1, 1991, the Court treated the motion as one for dismissal under Rule 41(b). The Court reserved judgment, effectively denying the motion. Pfizer renewed its motion for dismissal on November 25, 1991 when it submitted its written closing argument. Pfizer again cited Rule 52(c) although that rule still had not become effective. The Court need not address whether renewal of the motion is permitted under the Federal Rules of Civil Procedure as then in effect or as now amended or is even logical in a completed bench trial. Even assuming it is, this Memorandum of Decision moots that motion.

As the severity of the pain and limp increased and Porter's range of motion decreased, Porter, his family and physicians elected to try surgery. In March, 1975, Dr. Stephen Monaghan performed a right hip arthroplasty in Portland, Maine. *Id.* at 23. Dr. Monaghan inserted a Smith–Peterson cup in Porter's right hip, leaving the femur intact. The arthroplasty did not relieve Porter's distress.

Complaining that his right hip problems were worse than before, Porter was admitted to a Bangor hospital the following year for his first full hip replacement operation. Dr. Richard Kimball, an experienced orthopedic surgeon, removed the Smith–Peterson cup, and cemented an Au Franc–Turner cup in place. Kimball also removed part of Porter's femur, replacing it with an artificial femoral stem and head component. *Id.* at 27. With each successive hip operation, Porter's prognosis became less favorable. Porter was advised to find a sedentary line of employment. *Id.* at 32. The 1976 total hip replacement was otherwise more successful than the 1975 cup arthroplasty. Although he complained of back pain, Porter was told that he could jog or play tennis and reported that he had been skiing. *Id.* In a minor elective procedure the following year, some of the wires which were used to reattach muscle to bone during the 1976 total hip replacement operation were removed.

Porter's hip showed preliminary signs of loosening in 1980. *Id.* at 40. In 1981, with Porter again complaining of pain, Dr. Kimball advised him "to live as long as he can with his problem." *Id.* at 42. Expressing reservations about performing a "revision" (*i.e.*, another hip replacement surgery) on a patient still in his twenties, Dr. Kimball referred Porter to Dr. Roderick Turner in Boston. Dr. Turner, like Dr. Kimball, advised Porter to use a cane to protect his hip, *id.* at 41, 43, and to always wear shoe lifts to compensate for his leg length discrepancies.

Porter's acetabular cup continued to loosen and his leg became progressively shorter. In July, 1986, Porter was readmitted to a Bangor hospital for removal of the loosened artificial hip and installation of a Howmedica PCA artificial hip.

Porter returned to work in November, 1986. Subsequently, however, he developed lower back pain which his physicians attributed to a herniated disk and a bulging disk. He later developed elbow and neck pain as well. In February, 1988, increasing levels of pain prompted him to leave his position as a dental hygienist. Since then, he has also had to restrict his activities with his children and his recreational activities. In addition, pain has limited his capacity to perform household work and has reduced the frequency with which he and his wife are able to go out.

Porter began complaining about hip pain, which is often an excellent indication of acetabular loosening, in 1987. Early x-rays, however, failed to detect any loosening. Porter's continued concern prompted his physicians to perform additional tests in 1988 which confirmed premature acetabular loosening. *See* Defendant's Exhibit 13.

In 1988, Porter underwent his fourth major hip surgery. He did not return to Dr. Kimball, who had performed the 1976 and 1986 operations. Instead, Porter traveled to Boston where the loosened 61mm cup was removed and replaced with another Howmedica cup. Porter's new surgeon was able to successfully implant a cup without using cement. The pain which Porter complained of following his 1986 operation in his back, arm, hip and neck persists.

Howmedica, a division of Pfizer, manufactured the 64mm acetabular cup which broke as it was being implanted during the 1986 surgery. Although the cup is advertised for cemented use, the design team fashioned the cup so that it could be used with or without cement. *See* Defendant's Exhibit 21. Both in 1986 and today, many surgeons prefer to implant the cup without using cement, believing that it produces better results. In fact, a majority of Howmedica cups have been implanted in the "cementless mode."

According to the only witness to testify on the subject, the Howmedica one-piece acetabular cup is broken during implantation at a far lower rate than competing artificial hips. Since the product's intro-

duction, over 100,000 one-piece acetabular cups have been surgically implanted. Only 57 to 68 reports of failure have been received, a rate of approximately .068%.[4] Howmedica's competitors, on the other hand, have reported breakage rates approaching 10–12%. Howmedica's testing indicated that cup breakage occurs only when improper surgical technique is used. Surgeons, of course, are aware that acetabular cups are not indestructible because they need to know how to break acetabular cups for removal in "revision" surgery.

The 64mm cup that broke during the 1986 surgery was returned to Howmedica by the surgeon for examination. Though the text of the product experience report suggests that improper surgical technique caused the breakage,[5] Howmedica categorized the break as unexplained. *See* Defendant's Exhibit 27. Howmedica scrapped the cup in August, 1986, one month after the operation, without conducting any tests.

The product experience report notes that the cup was not owned by the hospital. *Id.* Because artificial hip systems are costly, Pfizer has developed a distribution system which permits surgeons and hospitals to limit the inventory they have to carry.[6] Pfizer sells the artificial hips through separately incorporated, independently owned companies whose salesmen provide hospitals with the artificial hip pieces the surgeons request for a particular surgery. The pieces are packaged in sterile containers and are not opened until needed during the course of operation. They are given a final, visual inspection before being used.

After a "loaner" hip is implanted, the salesman retains the unused and unopened sets and Pfizer bills the hospital or surgeon directly for pieces actually used during surgery. The patient is ultimately billed, directly or indirectly. The 64mm cup that broke during the 1986 operation was provided to the surgeon by Tim Robertson, a salesman for Howmedica Campbell, Inc. Had the cup been successfully implanted, Pfizer's witnesses conceded that the hospital, surgeon and/or Porter would certainly have been billed.

Dr. Kimball initially planned to implant an acetabular cup without using cement during the 1986 operation for several reasons. First, Porter had already undergone two hip operations and had a significant amount of bone removed.[7] Cups implanted without using cement require removal of less additional bone because no space needs to be cleared for cement. Second, the rapid loosening of the cup implanted in 1976 which had been cemented indicated that Porter did not tolerate cement well. Third, surgeons felt that cups implanted without the use of cement tended to last longer. Although Dr. Kimball intended to implant the cup without using cement, he nevertheless informed Porter before the operation cement might have to be used. *See* Defendant's Exhibit 13 at 53.

During the course of the operation, Dr. Kimball reversed Pfizer's recommended sequence of steps, implanting the femoral component before he implanted the acetabular cup. Although a patient's leg and hip are dislocated during surgery, an im-

---

4. Through 1986, the date of Porter's operation, approximately 7 or 8 reports of product breakage had been received by Howmedica. Since then, an additional 50 to 60 product failure reports have been filed. The testimony did not break down the number of cups implanted through 1986; the witness simply stated that 100,000 Howmedica acetabular cups have been implanted to the present date. The witness reported that this represents a product failure rate of .01%. Dividing 68 by 100,000, however, would yield a failure rate of .068%. Rounding, the rate is .1%. The Defendant's witness, unfortunately, didn't explain how he calculated his lower rate of product failure.

5. The report notes a variety of marks on the broken cup, including unusual hammer blow indentations on the cup's fixation pegs that are consistent with the use of excessive force and improper surgical technique.

6. Hospitals typically own a set of "universal" instruments, those used in all hip replacement operations with a particular brand of artificial hip. Hospitals sometimes stock artificial hip cups in commonly used sizes. The 64mm cup which the surgeon intended to use during Porter's hip surgery was unusually large and was not stocked by the hospital.

7. The 64mm cup which Dr. Kimball intended to use was one of the larger, if not the largest, sizes of Howmedica PCA artificial hips available.

planted femoral component ·obstructs access to the hip. As Dr. Kimball then tried to hammer the acetabular cup into Porter's hip, the polyethylene liner separated from the cup's metallic backing.[8] The broken cup had to be removed. Because Dr. Kimball had not requested a backup Howmedica 64mm one-piece acetabular cup, Tim Robertson, the salesman who provided the "loaner" pieces had not brought one. Robertson did have the next smaller size, a 61mm acetabular cup. The hospital also had in inventory three compatible types of acetabular cups: a two-piece Howmedica cup and a Bipolar cup which could have been used without cement and a Precision cup which could be used with cement. In any event, Dr. Kimball, the only person who ultimately could decide how to proceed, elected to use the 61mm one-piece Howmedica cup which Robertson provided. The smaller cup had to be cemented in place because Dr. Kimball had already drilled a space large enough to accommodate the 64mm cup.[9] Subsequent X-rays indicated that the cement mantle was uneven and suboptimal, compromising the longevity of the cup.

Substantial evidence was introduced indicating that a host of other causal factors may account for the pain which Porter now experiences. Porter and one of his physicians testified that Porter was not always a perfect patient. *See also, e.g., id.* at 41, 42, 82. Additional testimony was introduced that back pain and disc herniation are not uncommon in the general population. Finally, several witnesses testified that some of the pain experienced by Porter is a normal consequence of hip ·surgery.[10] Porter's hip pain, for example, may have resulted from the scarring which always accompanies hip surgery.

None of the medical witnesses, including Porter's own, would unequivocally attribute Porter's pain to the separation of the acetabular cup during the 1986 surgery. Pfizer's witnesses testified that there was no conceivable causal connection. Porter's witnesses were no more helpful. Dr. Kimball, the surgeon who performed the surgery, denied that the operation was the cause of Porter's pain. Dr. Michaud, the orthopedist Porter saw most frequently following surgery, attributed Porter's pain to loosening of the 61mm cup which Dr. Kimball implanted in an uneven cement mantle rather than to the breakage of the 64mm cup.

## II. Conclusions of Law

### A. Breach of Implied Warranty— Merchantability

Plaintiff's first claim is for breach of the implied warranty of merchantability. Porter contended that the 64mm acetabular cup was not "fit for the ordinary purposes for which such goods are used" because it broke as the surgeon attempted to implant it in Porter's hip. 11 M.R.S.A. § 2–314(2)(c).

Both the plaintiff and the defendant argued at length about whether there was a "sale" of the acetabular cup. Asserting that there was no "sale" because Porter was never billed, Pfizer argued that there could not have been a breach of warranty.[11] The Plaintiff responded that there was a "sale" because title to the cup passed to the plaintiff.

8. The surgeon does not—or should not—hammer directly on the acetabular cup. Rather, he should seat the cup with a specially designed set of instruments. If the instruments are improperly aligned or if the cup is struck directly, eccentric force may cause the polyethylene liner to shear.

9. According to the medical testimony, surgeons who intend to cement an artificial cup in place intentionally drill a hole which is 3mm larger than the cup they plan to insert to accommodate the cement.

10. Porter suffered from none of the more severe complications which sometimes result from hip surgery including infection or dislocation.

11. Pfizer argued that "[t]he plain language of Maine's strict liability statute and implied warranty statute requires there to have been a sale of the product to establish a cause of action. *See Stanley v. Schiavi Mobile Homes, Inc.,* 462 A.2d 1144 (Me.1983)." Defendant's Final Argument at 11. Pfizer, however, fails to note that Maine Supreme Court explicitly declined to hold "that the status of seller cannot arise prior to the consummation of a sale or transfer of title." *Stanley,* 462 A.2d at 1148 n. 7.

■ Neither final billing nor the passage of title is a threshold requirement for maintaining an action for the breach of an implied warranty of merchantability. Title to the acetabular cup is irrelevant because "[e]ach provision of [Article 2] with regard to the rights, obligations and remedies of the seller, the buyer, purchasers or other third parties applies irrespective of title to the goods except where the provision refers to such title," 11 M.R.S.A. § 2–401. Section 2–314 makes no mention of title. And, contrary to the argument of Pfizer, a completed "sale" (here, payment by the buyer) is not required. The warranty of merchantability arises in a "contract for [the] sale of goods." 11 M.R.S.A. § 2–314. The Plaintiff proved that there was a contract for the sale of the acetabular cup and that Porter would ultimately have been billed for the cup, evidence the Defendant did not persuasively rebut. As Pfizer argues in another context, "the court cannot abandon common sense in evaluating the evidence." Defendant's Final Argument at 25. Here, however, Pfizer is asking the Court either to believe that the cup was a gift or to adopt a sterile and formalistic view of Maine law completely at odds with the statutory requirement that the remedies provided to an aggrieved buyer be liberally construed. 11 M.R.S.A. § 1–106. Delays in billing do not provide immunity from breach of warranty actions.[12]

Whether the cup was merchantable presents a closer question. Each party argued in largely conclusory terms that breakage of a product under normal use may or may not be evidence of breach of warranty. Neither cited particularly persuasive authority.[13]

In *Sylvain v. Masonite Corporation*, 471 A.2d 1039 (Me.1984), the Maine Supreme Court addressed a set of facts which are substantially similar to those in the instant case. In *Sylvain*, seven couples purchased and installed hardboard siding manufactured by Masonite. Within days, weeks, or months, the siding warped, buckled, stained, rotted or delaminated. Affirming a jury verdict in favor of the couples, the Maine Supreme Court held that the plaintiffs had proven breach of the implied warranty of merchantability by presenting "testimony that, at the time of purchase, the Masonite siding was wrapped in its original packaging; evidence of the short lapse of time between purchase and installation of the siding and product failure; and testimony of carpenters that the siding was properly installed." *Id.* at 1041. In the instant case, witnesses presented similar testimony.

■ In *Sylvain*, the plaintiffs were also able to present testimony from an expert witness who was able to inspect and analyze samples of the siding. *Id.* In the instant case, the broken acetabular cup was returned by the salesman to Pfizer in July. Pfizer inspected the cup and then destroyed it in August 1986. As a practical matter, Porter never had an opportunity to inspect the cup. Expert testimony, however, is not invariably required in a breach of warranty case.

■ Ultimately, the Court need not determine whether the evidence Porter was able to present adequately established that the acetabular cup was defective. The Defendant presented considerable testimonial and tangible evidence demonstrating that the breakage of the cup resulted from abnormal surgical technique and misdirected force applied when the cup was implanted. The Defendant's explanation of why the

---

12. Even if the contract for sale were with the hospital or surgeon, Porter would still be entitled to maintain a cause of action for breach of the implied warranty of merchantability because he was a foreseeable, indeed the intended, user of the product. 11 M.R.S.A. § 2–318.

13. In support of its argument that breakage of a product alone does not prove that a product is defective, Pfizer cites *Valenti v. Surgiteck–Flash Medical Engineering Corp.*, 875 F.2d 466 (5th Cir.1989). At best, *Valenti* is inapposite. *Valen-*

*ti* is based on superseded provisions of Louisiana law regarding a so called "unreasonably dangerous per se" theory of recovery and that the medical device at the center of the case had been implanted for over two years before it broke with no mention of the product's expected longevity. Defendant's counsel clearly erred in asserting that *Valenti* dealt with breach of warranty as well as products liability claims when, in fact, no breach of warranty claim was raised. *See also* note 11, *supra*.

cup broke is equally plausible and its witnesses were equally credible. The Court concludes that the Plaintiff failed to sustain its burden of demonstrating by a preponderance of the evidence that the acetabular cup was not of merchantable quality and that it was not fit for ordinary purposes.

Even if the Plaintiff had proven that the acetabular cup was defective, he failed to demonstrate that that defect was the cause of his injuries. Although the breakage of the cup was a cause-in-fact of the Plaintiff's injuries, it was not the proximate cause of those injuries. Causation-in-fact, of course, is not difficult to show. The Plaintiff need only demonstrate that "but for" the breakage of the cup, he would not have sustained the injuries for which he seeks to recover. Plaintiff barely met even this relaxed test of causation.

■ It is entirely clear that Porter failed to demonstrate that his injuries were proximately caused by the separation of the polyethylene liner from the metallic shell. Although Porter may not have been in as advantageous a position after the cup separated as he had been before—principally because the surgeon was no longer able to proceed using the 64mm one-piece cup without cement as preferred and as intended—the subsequent decisions and actions of the surgeon, in particular the implantation of a smaller cup in an uneven layer of cement constitute a clear supervening cause. *See, e.g., Johnson v. Dubois,* 256 A.2d 733 (Me.1969).

■ Finally, as indicated above, the Plaintiff was unable to disentangle the respective roles that the 1986 surgery, the prior surgeries, the Plaintiff's failure to fully heed the instructions of his physicians to accommodate his disability and myriad common, natural causes of pain played in contributing to his injuries. Although it is true that a plaintiff need not demonstrate that an injury or damage had a single legal cause, *Roberts v. American Chain & Cable Co.,* 259 A.2d 43 (Me.1969), the plaintiff must produce sufficient evidence to permit the finder of fact to attribute fault on a reasoned basis. The evidence failed to prove that the breakage of the cup played anything other than a de minimis role in

producing the pain which Porter now suffers from. Plaintiff failed to prove by a preponderance of the evidence that his injuries were caused by the Defendant's product.

## B. Breach of Implied Warranty—Fitness for a Particular Purpose

■ The Plaintiff also sued for breach of the implied warranty of fitness for a particular purpose. In the instant case, Plaintiff's claim is untenable. Plaintiff failed to introduce any evidence that he had any "particular purpose" distinct from the ordinary purposes for which a patient seeks an artificial hip. Furthermore, he introduced no evidence demonstrating that he communicated any "particular purpose" to Pfizer or that Pfizer should otherwise have been aware of it. Finally, Porter failed to show that he was relying on Pfizer's skill or judgment to select or furnish a suitable product.

Maine's version of the Uniform Commercial Code provides:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is, unless excluded or modified under section 2–316, an implied warranty that the goods shall be fit for such purpose.

11 M.R.S.A. § 2–315. Plaintiff's evidence and argument simply dealt with the ordinary purpose for which artificial hips are implanted: restoring normal hip function to the extent possible.

In Maine,

> A "particular purpose" differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question. For example, shoes are generally used for the purpose of walking upon ordinary ground, but a seller may know

that a particular pair was selected to be used for climbing mountains.

11 M.R.S.A. § 2–315, comment 2. *See also Lorfano v. Dura Stone Steps, Inc.*, 569 A.2d 195, 197 (Me.1990) ("purchaser [must] have a particular purpose outside the scope of ordinary purposes"); *Duford v. Sears, Roebuck & Co.*, 833 F.2d 407, 413 (1st Cir.1987).

Unsurprisingly, given Plaintiff's failure to allege or prove that he had a "particular purpose", no evidence was introduced to demonstrate that Pfizer knew or had reason to know of a particular purpose, that Pfizer had reason to know that the Plaintiff was relying on Pfizer's skill or judgment, or that Plaintiff, in fact, relied on Pfizer to furnish suitable goods. *See Lorfano*, 569 A.2d at 197. Even if Porter had introduced evidence indicating that he had a "particular purpose" in mind, it is highly doubtful that he could have demonstrated that he intended to or, in fact, relied on the skill or judgment of Pfizer to select an appropriate artificial hip. The testimony, including that of the surgeon who performed the 1986 operation, clearly indicated that the surgeon is solely responsible for selecting the acetabular cup to implant in a patient. Plaintiff failed to prove any of the elements required to demonstrate breach of the implied warranty of fitness for a particular purpose.[14]

### C. Strict Liability

■ Plaintiff's final theory of the case is that Pfizer is strictly liable. Maine law provides:

> One who sells any goods or products in a defective condition unreasonably dangerous to the user or consumer … is subject to liability for physical harm thereby caused to a person whom the manufacturer, seller or supplier might reasonably have expected to use, consume, or be affected by the goods … if

the seller is engaged in the business of selling such a product and it is expected to and does reach the user or consumer without significant change in the condition in which it is sold. This section applies although the seller has exercised all possible care in the preparation and sale of his product and the user or consumer has not bought the product from or entered into any contractual relation with the seller.

14 M.R.S.A. § 221. Strict liability claims may be premised on design defects, manufacturing defects, or failure to warn. *See, e.g., Bernier v. Raymark Indus., Inc.*, 516 A.2d 534, 537 n. 3 (Me.1986). Porter never clearly identified which theory he was relying upon.

If Porter intended to argue that the acetabular cup was defective in design or manufacture, he cannot prevail. He presented no evidence that the utility of the design was outweighed by the risks or that any defects were introduced during manufacture.

■ If the Plaintiff sought to argue that Pfizer failed to adequately warn surgeons about the possibility of cup breakage during surgical impaction, he also failed to prove his case. *See, e.g., St. Germain v. Husqvarna Corp.*, 544 A.2d 1283 (Me.1988) (Maine applies "danger utility test"). "A product is not in a defective condition when it is safe for normal handling and consumption. If the injury results from abnormal handling, as where a bottled beverage is knocked against a radiator to remove the cap, or from abnormal preparation for use, … the seller is not liable." *Restatement (Second) of Torts*, § 402A, comment h at 351 (1965).[15] The manufacturer is only required to warn against foreseeable misuse. *Id.* Though failure to warn of foreseeable misuse can itself render a product unreasonably dangerous, *i.e.*, defective, Pfizer's

---

**14.** The Defendant asserted, and the Plaintiff unnecessarily conceded, that to prevail on his claim for breach of warranty of fitness for a particular purpose the Plaintiff had to prove that the product was defective. The product, however, need only have been unsuited to the "particular purpose." The parties might have avoided confusion had they not conflated their discussion of three conceptually distinct causes of action.

**15.** The Maine Legislature modeled its strict liability statute on § 402A of the Restatement (Second) of Torts. Maine courts may look to the Restatement for guidance when interpreting Maine's strict liability law. *See, e.g., Bernier*, 516 A.2d at 534.

product labels and surgical techniques manual were adequate to inform an experienced surgeon of the dangers of applying eccentric force in the instant case. The single piece of evidence which tended to show that the warnings were not adequate was a 1991 warning letter from the Food and Drug Administration to Howmedica indicating that the Howmedica one-piece acetabular cup was misbranded and thus dangerous. Plaintiff's Exhibit 16. The letter, however, is not particularly probative. The warnings given in 1986 need have been no better than the knowledge and information available to the manufacturer at the time of distribution permitted. *See, e.g., Bernier*, 516 A.2d at 540. The state of the art and the information available have changed rapidly and significantly in the past five years. Porter failed to demonstrate a link between the 1991 FDA letter and Pfizer's knowledge in 1986 when it had received only 7 or 8 reports of intraoperative breakage which would demonstrate that Pfizer ought to have provided any additional warnings to surgeons. The Plaintiff failed to prove that the warnings provided by Howmedica were inadequate.

In any event, Porter's strict liability claim fails for lack of evidence regarding proximate causation. Proof of causation, of course, is a required element of a strict liability claim. As discussed above, *see supra* II.A., Plaintiff failed to prove that his injuries were proximately caused by the breakage of the acetabular cup. Plaintiff cannot recover in strict liability.

III. *Summary*

For the foregoing reasons, the Court finds in favor of the Defendant. Plaintiff shall be awarded no damages. Judgment will be entered accordingly.

SO ORDERED.