STATE OF MAINE                          BUSINESS AND CONSUMER COURT
CUMBERLAND, ss                          Location: Portland
                                        Docket No.: BCD-CV-12-16
                                        JCN-CUM- 11/30 2013

                                    )
BONNIE BLACK, Personal Representative )
of the ESTATE OF GARY BLACK,         )
                                    )
            Plaintiff,              )
                                    )
                                    )
                                    )
        v.                          )        **DECISION AND ORDER**
                                    )      (Motion for Summary Judgment)
                                    )
AIR & LIQUID SYSTEMS, CORP., et al., )
                                    )
            Defendants              )
                                    )
                                    )
                                    )

This matter is before the Court on the Motion for Summary Judgment of Defendant New

England Insulation Co. (NEI). In this action, Plaintiff seeks to recover damages allegedly

resulting from the death of Gary Black (the Decedent) due to his exposure to asbestos during the

course of his employment at the St. Regis Paper Company (St. Regis). More specifically,

Plaintiff alleges that Decedent's exposure to asbestos occurred at the St. Regis Paper Company

(St. Regis) in Bucksport, Maine, where the Decedent worked from 1965 to 1974.[1] The Decedent

---

[1] The complaint alleges that the Decedent was exposed to multiple sources of asbestos in his career:

- in the engine room of the USS Decatur from 1958 to 1962 (2d Amend. Compl. ¶ 21);
- in the boiler maintenance room of the St. Regis from 1965 to 1974 (2d Amend. Compl. ¶ 22);
- from servicing American Standard and New York Boilers during a period of self-employment in the plumbing and heating business in the 1970s (2d Amend. Compl. ¶ 23); and
- from Cleaver-Brooks boilers while working for Belchar Oil Company in the 1980s (2d Amend. Compl. ¶ 24).

1

passed away on February 27, 2011. NEI argues that Plaintiff has failed to establish that Decedent came into contact with any asbestos products purchased by NEI and shipped to the St. Regis mill or any other asbestos that NEI may have provided, controlled, or disturbed.

I.    FACTUAL BACKGROUND

The following facts are undisputed, except where noted. *See Fore, LLC v. Benoit*, 2012 ME 1, ¶ 2, 34 A.3d 1125. The Decedent worked at the St. Regis paper mill from the second quarter of 1965 to the second quarter of 1974. (S.S.M.F. ¶8; O.S.M.F. ¶ 8.) Decedent solely worked in the steam plant at St. Regis, which plant was comprised of an old boiler house or boiler room and a new boiler room. (S.S.M.F. ¶ 10; O.S.M.F. ¶ 10.) Boilers numbered 1 through 4 were located in the old boiler house, and Boiler No. 5 was in the new boiler room. (S.S.M.F. ¶ 14; O.S.M.F. ¶ 14.)

Boilers 1 through 4 were coal-fired boilers and utilized external asbestos insulation. (S.S.M.F. ¶¶ 30, 23; O.S.M.F. ¶¶ 30, 23.) The old boilers were built around 1929 or 1930. (S.S.M.F. ¶ 15; O.S.M.F. ¶ 15; R.S.M.F. ¶ 12.) The conditions in the old boiler room were quite dusty. (S.S.M.F. ¶ 26; O.S.M.F. ¶ 26.) Alton Gross, who worked at the steam plant during the same period as the Decedent (S.S.M.F. ¶ 21; O.S.M.F. ¶ 21), said that the coal dust and asbestos occasionally came down in the old boiler room like snow. (Gross depo. 72:4-73:18 (cited by S.S.M.F. ¶ 26).)

Construction of the No. 5 boiler began in 1965, and the No. 5 boiler was completed and began operation in 1966. (S.S.M.F. ¶¶ 24, 36; O.S.M.F. ¶¶ 24, 36.) The workers generated a lot of dust during the construction of the No. 5 boiler. (O.S.M.F. ¶ 26; A.S.M.F. ¶ 7; R.S.M.F. ¶ 7.) The No. 5 Boiler did not require high temperature exterior insulation, i.e. asbestos; it used

---

The evidence generated during discovery, however, was limited to the Decedent's employment at St. Regis from 1965 to 1974. (S.S.M.F. ¶ 7; O.S.M.F. ¶ 7.)

mineral wool for insulation. (S.S.M.F. ¶¶ 26, 33; O.S.M.F. ¶¶ 26, 33.)[2] When repair work was performed on the No. 5 Boiler, the room was sealed off. (S.S.M.F. ¶ 28; O.S.M.F. ¶ 28.)

The Decedent worked in the old boiler room, as a spare and then as the old boiler operator until he left the mill. (S.S.M.F. ¶¶ 14, 29-31; O.S.M.F. ¶¶ 14, 29-31; A.S.M.F. ¶ 11; R.S.M.F. ¶ 11.) He also worked on the No. 5 boiler as a utility man and covered all of the steam plant. (S.S.M.F. ¶ 22; O.S.M.F. ¶ 22; A.S.M.F. ¶¶ 5, 11; R.S.M.F. ¶¶ 5, 11.) The Decedent worked at St. Regis when Boiler No. 5 was under construction in 1965, but he did not work on the construction of the boiler itself. (A.S.M.F. ¶ 6; R.S.M.F. ¶ 6; S.S.M.F. ¶ 25; O.S.M.F. ¶ 25.) There is no evidence that the Decedent worked anywhere at St. Regis other than the old boiler room and new boiler room. (S.S.M.F. ¶ 10; O.S.M.F. ¶ 10; *see also* S.S.M.F. ¶¶ 19-20; O.S.M.F. ¶¶ 19-20.)

NEI is an insulation company that performed work at St. Regis. (A.S.M.F. ¶ 2; R.S.M.F. ¶ 2.) NEI performed work at St. Regis from at least 1965 until 1970, and received shipments of asbestos pipecovering from Owens-Corning at the St. Regis mill during that time period. (S.S.M.F. ¶ 35; O.S.M.F. ¶ 35.) The invoices evidencing the shipments do not state where the pipecovering was to be used at the mill. (Def.'s Exh. B.)

David Harrison, who worked at the steam plant during the same period as the Decedent (S.S.M.F. ¶ 29; O.S.M.F. ¶ 29), recalled that NEI worked at the mill. The parties vigorously dispute the meaning of the following portion of his deposition testimony:

Q. Okay. Do you recall the employers of any of the other contractors that worked at St. Regis?
A. We used a company for insulation repair extensively, but I think that work was all done after 1976. I can't remember when we started doing that.
Q. Okay.

---

[2] NEI states that the No. 5 Boiler did not have *any* external insulation, but the record citation only supports that the No. 5 Boiler did not have any external *asbestos* insulation. (S.S.M.F. ¶ 26; Gross depo. 72:16-18.)

3

A.    At first it was done as an insulation repair to be more efficient, and it grew into an asbestos abatement program; but I think that was after 1976.

Q.    Do you recall the name of that contractor?

A.    New England Insulation. The other contractor of the boiler work was Eastern Refractories.

(Pl.'s Exh. 5 at 60:18-61:4.) NEI cites this testimony to support that it did not perform the insulation repair work until after 1976 (S.S.M.F. ¶ 32); Plaintiff cites the testimony to show that NEI repaired insulation before 1976, and then NEI's work grew into an asbestos abatement program after 1976 (O.S.M.F. ¶ 32.)

NEI was also involved in the "reinsulation" of the old boilers when the Decedent was working at the old power plant. (A.S.M.F. ¶ 9; R.S.M.F. ¶ 9.) The parties dispute whether the testimony of Mr. Gross shows that the Decedent was present or helped with the project. Mr. Gross's deposition testimony is as follows:

Q.    Okay. Let me ask you about the boiler reinsulation that was done you said by an outside contractor. I think you told us that that was New England Insulation; is that correct?

A.    Yes.

Q.    Was that something that was done during these boiler shutdowns?

A.    When those people showed up, there was usually – like I stated before, is when we have had a – a tube blow out inside that boiler.

Q.    Okay.

A.    We had to take the covering off the side of the boiler, remove the asbestos so that they could expose the water wall. And they had to cut those out of the way and get in there wherever that tube was.

Q.    Okay. Did that happen during the time that you and Mr. Black were working in the old power plant?

A.    Yes, it had. Yes, I know it had.

Q.    Can you put an estimate on how many times that would have happened? Can you give us any idea how many times that would have happened during that ten years?

A.    Maybe once or twice.

4

(Pl.'s Exh. 3 at 203:17-204:15.)[3] Plaintiff cites this testimony in support of the Plaintiff's contention that the Decedent was involved in the reinsulation work. (A.S.M.F. ¶ 9.) NEI denies the statement (R.S.M.F. ¶ 9) and cites different testimony from Mr. Gross, which Plaintiff maintains supports that Mr. Gross never worked the same shift or the same crew as the Decedent (S.S.M.F. ¶ 21; O.S.M.F. ¶ 21).

The parties also dispute whether Mr. Gross and the Decedent worked together during yearly maintenance overhauls of the boilers. Mr. Gross testified:

> A.     All right. We used to have a maintenance program that every year each unit was taken down – by unit I'm talking about a boiler – was taken down for an overhaul. It might be three weeks. It might be a month. And we would all have a sign-up sheet if we wanted to work on boiler overhaul which that was more money for you. It was good money. And we would come in and go to our maintenance shop, and the maintenance shop foreman would assign us the duties that day. And his crew might be off the same time mine was. *We – we might have – we could have been in there the same time doing those jobs the same day.*
> Q.     So you worked different crew, but when you did overhauls you might work during the same time?
> A.     See, we had a four-crew schedule.
> Q.     Is that true? Is what I said correct?
> A.     Yes.

(Pl.'s Exh. 3 at 31:17-32:9 (emphasis added).) Plaintiff cites this testimony as evidence that the Decedent and Mr. Gross worked on the overhauls together (A.S.M.F. ¶ 4); NEI denies the statement, and characterizes the possibility that the Decedent and Mr. Gross worked together as speculation (R.S.M.F. ¶ 4.)

Finally, NEI performed work in the old boiler room, but the parties dispute when the work was done. Mr. Staples, who worked at the steam plant during the same period as the Decedent (S.S.M.F. ¶ 12; O.S.M.F. ¶ 12), testified that the work was done in the early 1970s and before the Decedent left St. Regis. (Pl.'s Exh. 4 at 117:21-24, 119: 6-12.) NEI cites the

---

[3] Lines 11 to 15 of page 204, which address the frequency of this work, are not included in Plaintiff's citation but are included for context.

5

following exchange as evidence that the NEI work in the old boiler room was performed after the

Decedent left St. Regis:

> Q. Let me ask you some questions about New England Insulation. Did New England Insulation perform any work in the boiler house?
> A. Yes.
> Q. Okay. Did they perform work in the boiler house at the time that you and Gary were working there? Did they go back – were they doing work from the mid '60's onward?
> A. I think it was later on.

(Pl.'s Exh. 4 at 117:12-20.)

## II. DISCUSSION

### A. Standard of Review

Pursuant to M.R. Civ. P. 56(c), a moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, . . . show that there is no genuine issue as to any material fact set forth in those statements and that [the] party is entitled to a judgment as a matter of law." A party wishing to avoid summary judgment must present a prima facie case for each element of a claim or defense that is asserted. *See Reliance Nat'l Indem. v. Knowles Indus. Svcs.*, 2005 ME 29, ¶ 9, 868 A.2d 220. At this stage, the facts in the summary judgment record are reviewed "in the light most favorable to the nonmoving party." *Lightfoot v. Sch. Admin. Dist. No. 35*, 2003 ME 24, ¶ 6, 816 A.2d 63. A material fact is a fact that has "the potential to affect the outcome of the suit." *Burdzel v. Sobus*, 2000 ME 84, ¶ 6, 750 A.2d 573. "If material facts are disputed, the dispute must be resolved through fact-finding." *Curtis v. Porter*, 2001 ME 158, ¶ 7, 784 A.2d 18.

A factual issue is genuine when there is sufficient supporting evidence for the claimed fact that would require a fact-finder to choose between competing versions of the facts at trial. *See Inkel v. Livingston*, 2005 ME 42, ¶ 4, 869 A.2d 745. "Neither party may rely on conclusory

6

allegations or unsubstantiated denials, but must identify specific facts derived from the pleadings, depositions, answers to interrogatories, admissions and affidavits to demonstrate either the existence or absence of an issue of fact." *Kenny v. Dep't of Human Svcs.*, 1999 ME 158, ¶ 3, 740 A.2d 560 (quoting *Vinick v. Comm'r*, 110 F.3d 168, 171 (1st Cir. 1997)).

### B. Applicable Law

Plaintiff's primary causes of action against NEI are negligence and strict liability. "The essential elements of a claim for negligence are duty, breach, proximate causation, and harm." *Baker v. Farrand*, 2011 ME 91, ¶ 11, 26 A.3d 806. A plaintiff must demonstrate that "a violation of the duty to use the appropriate level of care towards another, is the legal cause of harm to" the plaintiff and that the defendant's "conduct [was] a substantial factor in bringing about the harm." *Spickler v. York*, 566 A.2d 1385, 1390 (Me. 1993) (internal citations omitted); *see also Bonin v. Crepeau*, 2005 ME 59, ¶ 10, 873 A.2d 346 (outlining negligence cause of action for supplying a product without adequate warnings to the user); RESTATEMENT (SECOND) OF TORTS § 388 (1965). "Maine's strict liability statute, [14 M.R.S. § 221 (2011)], imposes liability on manufacturers and suppliers who market defective, unreasonably dangerous products," including liability for defects based on the failure to warn of the product's dangers.[4] *See Bernier v. Raymark Indus., Inc.*, 516 A.2d 534, 537 (Me. 1986).

As the asbestos litigation has evolved both nationally and within Maine, the level of proof necessary to establish the requisite relationship between a plaintiff's injuries and a defendant's product has been subject of much debate. A majority of jurisdictions have adopted the standard articulated by the court in *Lohrmann v. Pittsburg Corning Corp.*, 782 F.2d 1156 (4th Cir. 1986), where the court construed the "substantial factor" test of the Restatement (Second) of

---

[4] In addition, strict liability can attach for a design defect or a defect in the manufacturing process. *See Pottle v. Up-Right, Inc.*, 628 A.2d 672, 674-75 (Me. 1993). Those theories of liability are not at issue in this case.

Torts.[5] In *Lohrmann*, the court announced and applied the "frequency-regularity-proximity test", which requires a plaintiff to "prove more than a casual or minimum contact with the product" that contains asbestos. *Lohrmann*, 782 F.2d at 1162. Rather, under *Lohrmann*, a plaintiff must present "evidence of exposure to a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked." *Id.* at 1162-63. *Lohrmann* suggests that the Court engage a quantitative analysis of a party's exposure to asbestos in order to determine whether, as a matter of law, the party can prevail.

Although the Maine Law Court has not addressed the issue, at least one Justice of the Maine Superior Court has expressly rejected the *Lohrmann* standard. Justice Ellen Gorman[6] rejected the *Lohrmann* standard "because it is entirely the jury's function to determine if the conduct of the defendant was a substantial factor in causing the plaintiff's injury and because it is not appropriate for the court to determine whether a plaintiff has proven that a defendant's product proximately caused the harm." *Campbell v. The H.B. Smith Co., Inc.*, Docket No. CV-04-57 at 7 (Me. Super. Ct., April 2, 2007) (Gorman, J).[7] In rejecting the *Lohrmann* standard, Justice Gorman wrote that to establish a *prima facie* case, a plaintiff must demonstrate:

> (1) medical causation – that the plaintiff's exposure to the defendant's product was a substantial factor in causing the plaintiff's injury and (2) product nexus – that the defendant's asbestos-containing product was *at the site where plaintiff worked or was present, and that the plaintiff was in proximity to that product at the time it was being used* ... a plaintiff must prove not only that the asbestos products were used at the worksite, but that the employee inhaled the asbestos from the defendant's product.

*Campbell* at 5-6. (citing, 63 Am. Jur. 2d Products Liability § 70 (2001).

---

[5] The Restatement (Second) of Torts is consistent with the causation standard in Maine. Section 431 provides in pertinent part that "[t]he actor's negligent conduct is a legal cause of harm to another if his conduct is a substantial factor in bringing about the harm ..."

[6] At the time, Justice Gorman was a member of the Maine Superior Court. Justice Gorman was subsequently appointed to the Maine Supreme Judicial Court.

[7] Justice Gorman also rejected the *Lohrmann* standard for similar reasons in *Boyden v. Tri-State Packing Supply, et al.*, Docket No. CV-04-452 (Me. Super. Ct., Feb. 28, 2007).

8

Insofar as under *Lohrmann* a plaintiff must prove exposure to asbestos over a sustained period of time while under the standard applied by Justice Gorman a plaintiff must only demonstrate that plaintiff was in proximity to the product at the time that it was being used, the *Lohrmann* standard imposes a higher threshold for claimants. The Court's decision as to the applicable standard cannot, however, be controlled by the standard's degree of difficulty. Instead, the standard must be consistent with basic principles of causation. In this regard, the Court agrees with the essence of Justice Gorman's conclusion – to require a quantitative assessment of a plaintiff's exposure to asbestos, as contemplated by *Lohrmann*, would usurp the fact finder's province. Whether a defendant's conduct caused a particular injury is at its core a question of fact. The Court perceives of no basis in law to deviate from this longstanding legal principle. The Court, therefore, concludes that in order to avoid summary judgment, in addition to producing evidence of medical causation, a plaintiff must establish the product nexus through competent evidence. In particular, a plaintiff must demonstrate (1) that the defendant's product was at the defendant's work place, (2) that the defendant's product contained asbestos, (3) and that the plaintiff had personal contact with the asbestos from the defendant's product. If a plaintiff produces such evidence, which can be either direct or circumstantial, the question of whether the defendant's product was a "substantial factor" in causing the plaintiff's damages is for the jury.

Thus, to survive the motion for summary judgment, the Plaintiff must first demonstrate that: (1) NEI's product was at St. Regis, (2) NEI's product at St. Regis contained asbestos, and (3) the Decedent had personal contact with asbestos from NEI's product. "If a plaintiff produces such evidence, which can be either direct or circumstantial, the question of whether the defendant's product was a 'substantial factor' in causing the plaintiff's damages is for the jury."

9

*Rumery v. Garlock Sealing Techs.*, 2009 Me. Super. LEXIS 73, at *8 (Apr. 24, 2009); *see also Addy v. Jenkins, Inc.*, 2009 ME 46, ¶ 19, 969 A.2d 935 ("Proximate cause is generally a question of fact for the jury."). In other words, regardless of whether theory of liability is general negligence, negligent failure to warn, or strict product liability failure to warn, Plaintiff must present evidence that the Decedent was at least in the presence of NEI's asbestos containing products or asbestos related activity to make out a prime facie case of each cause of action.

NEI argues the case as one based principally on products liability, and focuses much of its statements of material facts on the construction of the No. 5 Boiler at the paper company.[8] The construction of the No. 5 boiler coincides with the Decedent's tenure at St. Regis and the period in which NEI received multiple shipments of Owens-Corning asbestos pipecovering at the St. Regis Paper Co. (*See* S.S.M.F. ¶¶ 8, 24, 35-36; O.S.M.F. ¶¶ 8, 24, 35-36.) Nevertheless, as NEI points out, none of the invoices documenting the shipments indicates where the pipecovering was to be used at the paper mill. (MSJ 4.) Further, Plaintiff has admitted that the No. 5 boiler did not utilize asbestos insulation. (S.S.M.F. ¶¶ 26, 33; O.S.M.F. ¶¶ 26, 33.) To the extent, therefore, that Plaintiff's claim is based on a strict liability theory, summary judgment is appropriate.

Perhaps recognizing the limits of the strict liability claim, Plaintiff argues the case as one based on general negligence, i.e., the duty at issue is based on NEI handling hazardous asbestos material at St. Regis and thereby becoming obligated to protect St. Regis employees from exposure to asbestos dust and particles. *See Baker v. Farrand*, 2011 ME 91, ¶ 11, 26 A.3d 806 ("The essential elements of a claim for negligence are duty, breach, proximate causation, and harm."). In order to survive the motion for summary judgment Plaintiff must show that the Decedent was exposed to asbestos from NEI's negligent handling of the substance. "If a plaintiff

---

[8] The statements of material facts do not address whether NEI ever worked on the construction of the No. 5 Boiler.

10

produces such evidence, which can be either direct or circumstantial, the question of whether the defendant's [conduct] was a 'substantial factor' in causing the plaintiff's damages is for the jury." *Rumery v. Garlock Sealing Techs., Inc.*, 2009 WL 1747857, at *8 (Me. Super. Apr. 24, 2009); *see also Addy v. Jenkins, Inc.*, 2009 ME 46, ¶ 19, 969 A.2d 935 ("Proximate cause is generally a question of fact for the jury.").

Viewed most favorably to the Plaintiff, the testimony of Mr. Harris and Mr. Staples establishes that NEI performed insulation work in the steam plant during the Decedent's employment at St. Regis. (*See* S.S.M.F. ¶¶ 12, 32; O.S.M.F. ¶¶ 12, 32.) In addition, while there is evidently a disputed issue as to when NEI began abating asbestos at the steam plant (before or after 1976), viewed most favorably to Plaintiff, for purposes of the summary judgment motion, the work began when Decedent was working at St. Regis. (*See* S.S.M.F. ¶ 32; O.S.M.F. ¶ 32.)

Plaintiff also cites the testimony of Mr. Gross in support of the negligence claim. Mr. Gross worked with the Decedent during yearly maintenance overhauls of boilers. (*See* A.S.M.F. ¶ 4; R.S.M.F. ¶ 4.) With respect to the reinsulation project, Mr. Gross testified:

Q. Okay. Let me ask you about the boiler reinsulation that was done you said by an outside contractor. I think you told us that that was New England Insulation; is that correct?
A. Yes.
Q. Was that something that was done during these boiler shutdowns?
A. When those people showed up, there was usually – like I stated before, is when we have had a – a tube blow out inside that boiler.
Q. Okay.
A. We had to take the covering off the side of the boiler, remove the asbestos so that they could expose the water wall. And they had to cut those out of the way and get in there wherever that tube was.
Q. Okay. Did that happen during the time that you and Mr. Black were working in the old power plant?
A. Yes, it had. Yes, I know it had.
Q. Can you put an estimate on how many times that would have happened? Can you give us any idea how many times that would have happened during that ten years?
A. Maybe once or twice.

11

(Pl.'s Exh. 3 at 203:17-204:15.)

Although the deposition testimony of the Decedent's co-workers (Basil Staples and Alton Gross) can be viewed as somewhat vague and subject to interpretation, when considered in the light most favorable to Plaintiff, a fact finder could reasonably determine that while Decedent worked at St. Regis, Defendant's employees worked on and handled the insulation in a way that generated asbestos dust particles in the Decedent's work area. To make that determination, the fact finder will have to assess the credibility of the co-workers. For summary judgment purposes, therefore, Plaintiff has established the necessary product nexus to avoid the entry of judgment at this stage of the proceedings.

III. CONCLUSION

Based on the foregoing analysis, the Court orders:

The Court grants NEI's motion summary judgment on Plaintiff's strict liability claim, and denies NEI's motion for summary judgment on Plaintiff's negligence claim.

Pursuant to M.R. Civ. P. 79(a), the Clerk shall incorporate this Decision and Order into the docket by reference.

Date: 11/22/13

_____
Justice, Maine Business & Consumer Court

Entered on the Docket: 11-26-13
Copies sent via Mail ___ Electronically ✓

12

**Bonnie Black, Personal Representative of the Estate of Gary Black
v. Air & Liquid Systems, Corp., et al.
BCD-CV-12-16**

**Bonnie Black, Personal Representative of the Estate of Gary Black
    Petitioners / Plaintiffs**

    Counsel:                        William G. Higbee, Esq.
                                       McTeague, Higbee, Case, Cohen, Whitney,
                                          & Toker P.A.
                                     Four Union Park
                                     PO Box 5000
                                     Topsham, ME. 04086

**New England Insulation Co. Inc.
    Respondents / Defendants**

    Counsel:                        Theodore Kirchner, Esq.
                                        Norman, Hanson & Detroy, LLC.
                                        Two Canal Plaza
                                        PO Box 426
                                        Portland, ME 04112